<u>Tyrie Washington v. State of Maryland</u>, No. 15, September Term, 2022

**<u>TERRY</u> STOPS – REASONABLE ARTICULABLE SUSPICION – UNPROVOKED, HEADLONG FLIGHT – HIGH-CRIME AREA –** Supreme Court of Maryland* held that, assessing totality of circumstances, law enforcement officer had reasonable articulable suspicion to stop defendant based on defendant's unprovoked, headlong flight from uniformed officers in marked and unmarked cars, with another person, that included jumping over fences and trying to hide behind bush, in high-crime area. Supreme Court of Maryland reiterated that reasonable suspicion must be assessed under totality of circumstances, which can include consideration that unprovoked flight may be consistent with innocence, when determining what weight to give unprovoked flight from police, but determined that in this case, nature of flight and other circumstances outweighed more innocent inferences from defendant's flight.

Supreme Court of Maryland concluded that under totality of circumstances assessment, in determining whether reasonable suspicion for <u>Terry</u> stop is established, along with evidence that location is high-crime area, court may consider whether flight could be reasonably perceived as factor indicating that criminal activity is afoot or factor consistent with innocence, which may include consideration of circumstance that unprovoked flight may occur for innocent reasons, including those associated with fear of police officers.

\*At the time of oral argument in this case, the Supreme Court of Maryland was named the Court of Appeals of Maryland. At the November 8, 2022 general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Appeals of Maryland to the Supreme Court of Maryland. The name change took effect on December 14, 2022.

Circuit Court for Baltimore City
Case No. 420234003

Argued: November 3, 2022

IN THE SUPREME COURT

OF MARYLAND*

No. 15

September Term, 2022

_____

TYRIE WASHINGTON

v.

STATE OF MARYLAND

_____

Fader, C.J.
Watts
Hotten
Booth
Biran
Gould
Eaves,

JJ.

_____

Opinion by Watts, J.
Hotten, J., dissents.

_____

Pursuant to the Maryland Uniform Electronic Legal Materials
Act (§§ 10-1601 et seq. of the State Government Article) this
document is authentic.

Filed: December 19, 2022



Gregory Hilton, Clerk

*At the November 8, 2022 general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Appeals of Maryland to the Supreme Court of Maryland. The name change took effect on December 14, 2022.

In recent years, the Baltimore Police Department has experienced a series of unsettling events, giving rise to what has been described as an increased public awareness of police misconduct and a fear of police officers by some residents of Baltimore City, particularly those who are African American. Due to disquieting events of late across the country and in our State, this dynamic has not been limited to Baltimore City.

Over the last several years, among other events, protests occurred in Baltimore City after the death of Freddie Carlos Gray, Jr., a young African American man, in police custody, a United States Department of Justice investigation found that the Baltimore Police Department "deployed a policing strategy that, by its design, led to differential enforcement in African-American communities," U.S. Dep't of Justice, Civil Rights Div., Investigation of the Balt. City Police Dep't at 8 (Aug. 10, 2016), available at https://www.justice.gov/crt/file/883296/download [https://perma.cc/YJU8-6YAW], and "in a shocking and unfortunate scandal, it was discovered that members of the Department's Gun Trace Task Force had engaged in what has been described as 'a wide-ranging, years-long racketeering conspiracy'" that included officer assaults, robberies, and extortion of people in Baltimore City, Balt. City Police Dep't v. Potts, 468 Md. 265, 271, 276, 278, 227 A.3d 186, 190, 193-94 (2020). In addition to media coverage generated by the foregoing events, footage from cell phones and body-worn cameras has displayed graphic images of violence involving police, sometimes deadly, against people, particularly African American people, in encounters with law enforcement officers in various parts of the country.

In the instant case, we must address the import of this reality in determining the

constitutionality of police stops of people on the street. In <u>Terry v. Ohio</u>, 392 U.S. 1, 30 (1968), the Supreme Court held that a law enforcement officer may stop an individual for a brief investigatory detention when the "officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot[,]" *i.e.*, a <u>Terry</u> stop must be supported by reasonable suspicion of criminal activity. Using the standard set forth in <u>Terry</u>, in <u>Illinois v. Wardlow</u>, 528 U.S. 119, 124-25 (2000), the Supreme Court concluded that reasonable suspicion justified the stop of a defendant who fled from police officers without provocation in a high-crime area. Repeatedly, the Supreme Court has instructed in its case law that a court must assess the totality of the circumstances surrounding a stop to determine whether it was justified by reasonable suspicion. <u>See</u> <u>United States v. Arvizu</u>, 534 U.S. 266, 273-74 (2002); <u>United States v. Cortez</u>, 449 U.S. 411, 417-18 (1981). Based on Supreme Court case law, this Court has adopted the same totality of the circumstances analysis. <u>See</u> <u>Collins v. State</u>, 376 Md. 359, 368, 829 A.2d 992, 997 (2003).

This case stems from the contention that, due to increased public awareness of police misconduct, people, particularly young African American men, fear encounters with police officers and that, as such, unprovoked flight in a high-crime area should no longer be considered factors that give rise to reasonable articulable suspicion for a <u>Terry</u> stop. The resolution of this contention is necessary to determine whether the trial court properly denied a motion to suppress a handgun seized from Tyrie Washington, Petitioner.

Washington and another person were standing in an alley in Baltimore City when they saw a marked police vehicle. Both Washington and the other person fled. After seeing

a different unmarked police vehicle, Washington ran, jumped over a fence and tried to hide behind a bush in a backyard. Detective Alex Rodriguez got out of the second vehicle, and Washington ran and jumped over another fence. Ultimately, Detective Rodriguez stopped Washington, whereupon another detective found a handgun in Washington's waistband.

Although two of the detectives involved testified as to observing details that indicated Washington might have a gun, neither of the detectives had advised Detective Rodriguez of the observations. Detective Rodriguez had not seen any sign of a weapon but had seen Washington fleeing, jumping fences, and trying to hide. All three of the testifying detectives testified that the block where Washington was stopped, and the immediate vicinity, constituted a high-crime area.

Washington contends that Detective Rodriguez lacked reasonable suspicion to stop him based solely on his unprovoked flight in a high-crime area. Washington asserts that young African American men like himself have legitimate fears of mistreatment at the hands of police, providing an innocent reason for his flight, such that his fleeing in a high-crime area was not sufficient to support reasonable suspicion for a stop. According to Washington, an increased public awareness of police misconduct toward African American men, combined with the specific history of police misconduct in Baltimore City, renders outdated the conclusion in Wardlow that unprovoked flight is suggestive of wrongdoing.

The State, Respondent, contends that the Supreme Court considered the essence of Washington's argument in Wardlow and rejected it, concluding that potentially innocent reasons for flight were not enough to overcome a "commonsense" presumption that unprovoked flight from police is indicative of wrongdoing. Wardlow, 528 U.S. at 125

(citation omitted). The State argues that Washington's case is factually indistinguishable from Wardlow, supporting a conclusion that the stop of Washington was constitutional.

Against this backdrop, we hold that, under the totality of the circumstances analysis, a court may consider whether unprovoked flight is an indication of criminal activity that, coupled with evidence of a high-crime area and any other relevant factors, establishes reasonable suspicion for a stop, or whether unprovoked flight, under the circumstances of the case, is a factor consistent with innocence that adds little or nothing to the reasonable suspicion analysis. In Wardlow, 528 U.S. at 125, in concluding that reasonable suspicion for a Terry stop existed, the Supreme Court explained that people may flee for a variety of reasons, including innocence, and that "the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior." (Citation omitted); see also Wardlow, 528 U.S. at 132-35 (Stevens, J., concurring in part and dissenting in part). As such, in Wardlow, the Supreme Court did not establish a *per se* rule that unprovoked flight in a high-crime area always gives rise to reasonable articulable suspicion for a Terry stop.

In keeping with the Supreme Court's holding in Wardlow, we conclude that unprovoked flight in a high-crime area does not automatically equal reasonable articulable suspicion for a Terry stop. Rather, under the totality of the circumstances assessment, in determining whether reasonable suspicion for a Terry stop is established, along with evidence that a location is a high-crime area, a court may consider whether unprovoked flight could reasonably be perceived as a factor justifying a conclusion that criminal activity is afoot or a factor consistent with innocence, including the circumstance that some

individuals may fear interactions with police officers in Baltimore City and elsewhere.

Applying this analysis, we conclude that Detective Rodriguez had reasonable articulable suspicion to stop Washington. The specific nature and context of Washington's flight, his other evasive maneuvers, and its occurrence in a location that was established to be a high-crime area lead us to this conclusion. Washington fled not only at the sight of uniformed detectives in a marked police car, but also at the other end of an alley when he spotted different detectives in an unmarked car. Washington fled, headlong, completely unprovoked, and simultaneously with the other individual standing with him in the alley. He also jumped fences and attempted to conceal himself behind a bush while fleeing.

Testimony at a suppression hearing supported the trial court's conclusion that the block on which Detective Rodriguez stopped Washington was a high-crime area. Detective Lopez testified that he had seized approximately 10 to 15 handguns on the specific block of Oakmont Avenue where Washington was stopped "within a three-month span last year." Testimony from other detectives concerned drug trafficking, homicides, shootings, and robberies in the immediate vicinity of Washington's stop. For all of these reasons, we conclude that Detective Rodriguez had reasonable articulable suspicion to stop Washington and that the stop did not violate Washington's rights under the Fourth Amendment.

For the same reasons, we hold that Detective Rodriguez did not violate Washington's rights under Article 26 of the Maryland Declaration of Rights.[1] We decline

---

[1]Article 26 states:

to disturb our longstanding practice of interpreting Article 26 *in pari materia* with the Fourth Amendment.

In short, reasonable suspicion for Washington's stop existed, and we affirm the judgment of the Appellate Court of Maryland (at the time named the Court of Special Appeals of Maryland).[2]

## BACKGROUND

Facing gun charges, Washington filed a motion to suppress a firearm recovered from him, alleging that he was stopped without reasonable suspicion in violation of the Fourth Amendment to the United States Constitution and Article 26 of the Maryland Declaration of Rights. On June 16, 2021, the Circuit Court for Baltimore City conducted a hearing on the motion to suppress. The State called as witnesses Detectives Darwin Noesi, Israel Lopez, and Alex Rodriguez of the Baltimore Police Department. Washington did not call any witnesses.

Detective Noesi testified first. He testified that he was assigned to the Northwest District Action Team, which he described as "a narcotics team" whose "main focus is pretty

That all warrants, without oath or affirmation, to search suspected places, or to seize any person or property, are grievous and oppressive; and all general warrants to search suspected places, or to apprehend suspected persons, without naming or describing the place, or the person in special, are illegal, and ought not to be granted.

Although Article 26 does not expressly prohibit unreasonable searches and seizures, we have interpreted it to do so. See Dehn Motor Sales, LLC v. Schultz, 439 Md. 460, 486, 96 A.3d 221, 237 (2014).

[2]At the November 8, 2022 general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Special Appeals of Maryland to the Appellate Court of Maryland. The name change took effect on December 14, 2022.

much driving around hot areas . . . , high-crime areas and enforc[ing] drug distribution and handgun violations." Detective Noesi testified that, on July 9, 2020, at approximately 12:15 p.m., he was in uniform in a marked police vehicle that Detective Winkey was driving down Cordelia Avenue toward Reisterstown Road.[3] Detective Noesi testified that they were on routine patrol in the area because of homicides and robberies associated with drug dealing. More specifically, Detective Noesi testified that "areas of Reisterstown [Road] and side streets[,]" including Cordelia and Oakmont Avenues, have "high crime and [a] large amount of individuals selling and distributing narcotics."

Detective Noesi testified that he and Detective Winkey were not responding to any calls for service but rather were there because the area was one that they paid special attention to and needed to show a police presence in. Detective Noesi testified that they were patrolling with two other members of their team, Detectives Lopez and Rodriguez, who they knew were nearby on Oakmont Avenue, the next street over from Cordelia Avenue.

Detective Noesi testified that he observed Washington and another person standing in the alley off Cordelia Avenue. According to Detective Noesi, he was unfamiliar with Washington and did not see him or the other person engage in a hand-to-hand transaction or any apparent drug activity. Detective Noesi indicated that Washington and the other person were "just standing there in the alley[,]" and that he was not sure whether they were conversing. Detective Noesi testified that after Washington looked directly at the police

---

[3]Detective Noesi testified that he was a passenger in the car driven by Detective Winkey. Detective Winkey did not testify at the suppression hearing.

car, he and the other person immediately ran away toward Oakmont Avenue.

Detective Noesi testified that either he or Detective Winkey radioed Detectives Lopez and Rodriguez that two individuals had taken off running. According to Detective Noesi, he and Detective Winkey drove onto Reisterstown Road to reach Oakmont Avenue to follow Washington and the other individual and see why they were running. Detective Noesi testified that he saw Washington "kind of manipulating something at his front as he[ was] running." Detective Noesi testified that he observed Washington jump over a fence and try to hide under some bushes, which he found "real suspicious." He testified that Washington then jumped again and ran toward Oakmont Avenue, and Detective Rodriguez detained him. Detective Noesi testified that he and Detective Winkey exited their vehicle at this point, in the 3700 block of Oakmont Avenue, and that Detective Lopez patted Washington down and recovered a handgun from his waistband.

During Detective Noesi's direct examination, the State offered into evidence his body-worn camera footage from the time of the stop. The body-worn camera is designed to record approximately 30 seconds of video without audio before being turned on. Washington's counsel played portions of the body-worn camera footage during cross-examination of Detective Noesi. Detective Noesi testified that from the beginning of his observations to Washington's arrest took approximately 20 seconds. On the stand, Detective Noesi pointed out the alley off Cordelia Avenue, his and Detective Winkey's progress onto Reisterstown Road and Oakmont Avenue, and the backyard where Washington had jumped the fence and tried to hide before running again.

Next, Detective Lopez testified that he had been assigned to the Northwest District

Action Team for approximately two years and that, on July 9, 2020, at approximately 12:15 p.m., he was on patrol, wearing a uniform and sitting with Detective Rodriguez in an unmarked police vehicle in the 3700 block of Oakmont Avenue. Detective Lopez testified that the area was "[v]ery violent[,]" and that he had "had a couple of homicide shootings and robberies in the area[.]" Detective Lopez testified that he had seized approximately 10 to 15 handguns on "that one block" within a three-month period in the last year. According to Detective Lopez, Detective Winkey said on the radio that two people had just taken off running from the 4800 block of Cordelia Avenue down an alley. Detective Lopez testified that, at that moment, he and Detective Rodriguez were speaking with individuals at the corner of Oakmont Avenue and Litchfield Avenue, near the alley in question. He testified that as they drove toward the alley, Washington—with whom Detective Lopez was unfamiliar—came running in the direction of the vehicle that Detective Lopez was in, saw it, turned around, jumped over a fence, and tried to hide behind a bush.

According to Detective Lopez, Detective Rodriguez exited the vehicle, and Washington fled again and jumped over another fence. Detective Lopez testified that as Washington was doing so, Detective Lopez "noticed a large bulge in his pants -- his dip area, waistband." On cross-examination, Detective Lopez testified that he did not advise any of the other detectives of this observation. Detective Lopez testified that after Detective Rodriguez detained Washington, he (Detective Lopez) approached Washington and recovered a gun from his pants.

The State offered footage from Detective Lopez's body-worn camera into evidence. Detective Lopez pointed out where on Oakmont Avenue he and Detective Rodriguez saw

Washington and the other individual emerge from the alley that led to Cordelia Avenue and the general area where Washington attempted to hide behind a bush, which was "not normal[.]" Detective Lopez testified that the footage showed him reversing the car to reposition it after Washington jumped the second fence and attempted to evade Detective Rodriguez. This was footage captured automatically by the camera in the seconds before Detective Lopez turned it on. Thereafter, the footage captured the recovery of the gun from Washington's waist area.

Lastly, Detective Rodriguez testified that, on July 9, 2020, he was assigned to the Northwest District Action Team, and had been for approximately five months. Detective Rodriguez testified that members of the District Action Team had been assigned to patrol high-crime areas, which included the 3700 block of Oakmont Avenue. Detective Rodriguez testified that, on July 9, 2020, at approximately 12:15 p.m., he was in uniform with Detective Lopez in an unmarked vehicle in the 3700 block of Oakmont Avenue. According to Detective Rodriguez, the area was known for shootings and robberies. Detective Rodriguez testified that he and Detective Lopez were on patrol, rather than responding to a call for service, and had been talking with some individuals on the block. Detective Rodriguez testified that Detective Winkey said on the radio that two unidentified people were running through an alley from Cordelia Avenue to Oakmont Avenue.

Detective Rodriguez testified that he saw Washington and another person run out from the alley and cross Oakmont Avenue. According to Detective Rodriguez, Washington at first ran toward the detectives, but "when he observed that we were coming down, he immediately turned around" and went into a backyard, where he tried to hide

behind a bush.  Detective Rodriguez testified that he exited the vehicle to "further investigate," Washington fled again, and Detective Rodriguez pursued.  Detective Rodriguez testified that, when he exited the car, he was initially about twenty feet behind Washington.  Detective Rodriguez testified that, after both of them jumped over a fence, he grabbed Washington.[4]

Detective Rodriguez testified that after Washington was handcuffed, Detective Lopez found a handgun in Washington's "front waistband area."  Per his testimony, Detective Rodriguez had not seen a bulge in Washington's clothing or any other sign of a weapon while chasing him.

On cross-examination, Washington's counsel offered as evidence footage and still photos from Detective Rodriguez's body-worn camera.  Detective Rodriguez testified that the footage showed the officers' car moving down Oakmont Avenue toward the alley, his indication to Detective Lopez where Washington was trying to hide behind a bush, and Detective Rodriguez leaving the car, chasing after, and detaining Washington.  The still photos showed, per Detective Rodriguez's testimony, snapshots of his pursuit of Washington, including jumping the fence.  While footage from his body-worn camera was being played, Detective Rodriguez responded: "Yes, ma'am" to the question: "[T]hat's the first fence and then there's another little fence?"

---

[4]This testimony is consistent with Detective Noesi's testimony that he observed Washington jump over a fence and try to hide under bushes and Detective Lopez's testimony that "[o]nce Detective Rodriguez exited the vehicle and -- to further investigate him while he was running and jumping the fence and concealing his body in the fence, the defendant jumped the fence again[.]"

After the detectives testified, the circuit court heard arguments by the parties. In opposition to Washington's motion to suppress, the State argued that, in Wardlow, the Supreme Court held "that the defendant's presence in an area of heavy narcotics trafficking and his unprovoked flight upon noticing police created reasonable suspicion justifying a Terry stop." The State contended that the same fact pattern existed in Washington's case, because he fled police, unprovoked, in a high-crime area. The State asserted that, as a result, the detectives had reasonable articulable suspicion that justified a brief detention to investigate under Terry. The State argued that under Terry, once Washington was detained, the detectives were also justified in frisking him because Detective Lopez had reasonable articulable suspicion that Washington was armed because of the bulge that had been observed. The State again contended that Wardlow is directly on point with this case and therefore asked the circuit court to deny the motion to suppress.

Washington's counsel contended that, under Wardlow, unprovoked flight from a law enforcement officer is merely one factor to consider in assessing whether there is reasonable articulable suspicion and that, here, such flight was the only applicable factor. Washington's counsel observed that, in the decades since the Supreme Court decided Wardlow in 2000, the Black Lives Matter movement had begun, the Baltimore Police Department had entered into a consent decree, and officers of the Gun Trace Task Force had been arrested. Washington's counsel argued that, accordingly, "[i]t's not unusual to distrust the police in Baltimore" and flight from officers "should not be considered as a factor supporting reasonable articulable suspicion." Washington's counsel asserted that, even if the detectives did not violate Washington's rights under the Fourth Amendment,

the circuit court could determine that they violated his rights under Article 26.

After hearing arguments, ruling orally, the circuit court denied the motion to suppress. The circuit court found that Washington and the other person ran "for no reason" upon seeing uniformed detectives in a marked police vehicle. This occurred, the circuit court noted, in a high-crime area, Oakmont and Cordelia Avenues, "known for drug dealing, drug robberies, murders, shootings." The circuit court concluded that reasonable articulable suspicion existed in light of Washington running away, jumping over a fence, trying to hide behind a bush, jumping over a fence again, and fleeing from detectives. The circuit court found significance in the fact that the initial flight was from a marked police car, while in Wardlow the police vehicles had been unmarked.[5] In addition, the circuit court observed that Washington was wearing tight pants, such that "the imprint of a firearm was plain and simple[.]"[6]

On July 19, 2021, the circuit court conducted a proceeding to consider a conditional plea agreement reached between the State and Washington. The agreement stipulated that Washington would tender a conditional guilty plea to possession of a regulated firearm and retain the right to appellate review of the denial of the motion to suppress. The circuit court found that Washington tendered the conditional guilty plea freely, knowingly, and voluntarily, and determined that the facts that the prosecutor proffered were sufficient to

---

[5]In Wardlow, the police vehicles were described as "a four car caravan" in the majority opinion, see 528 U.S. at 121, and as "four patrol cars" in the concurring and dissenting opinion, see id. at 137 (Stevens, J., concurring in part and dissenting in part).

[6]Given our holding concerning the application of Wardlow, we need not address whether the circuit court's observation concerning the imprint of a firearm on Washington contributed to its reasonable suspicion analysis.

find Washington guilty. The circuit court accepted the conditional guilty plea and sentenced Washington to ten years of imprisonment, with all but five years suspended, followed by two years of supervised probation. Later that day, Washington noted an appeal.

**Opinion of the Appellate Court of Maryland**

On March 24, 2022, in an unreported opinion, the Appellate Court of Maryland affirmed the circuit court's judgment. See Tyrie Washington v. State, No. 739, Sept. Term, 2021, 2022 WL 873315, at *1 (Md. Ct. Spec. App. Mar. 24, 2022). The Appellate Court of Maryland explained that "[i]n Illinois v. Wardlow, the Supreme Court held that it was not a violation of the Fourth Amendment to stop an individual who fled 'upon seeing police officers patrolling an area known for heavy narcotics trafficking.'" Washington, 2022 WL 873315 at *4 (quoting Wardlow, 528 U.S. at 121). The Court interpreted Wardlow as concluding that "while it is 'undoubtedly true' that there are innocent reasons to flee from police, and that flight from police is not necessarily indicative of wrongdoing, both *Terry* and the Fourth Amendment accept the risk that officers may stop or even arrest innocent people." Washington, 2022 WL 873315 at *5 (quoting Wardlow, 528 U.S. at 125). The Appellate Court of Maryland stated that this Court, citing Wardlow, "has stated that 'unprovoked flight or presence in a high crime area, or both, are individual factors that may contribute to the reasonable suspicion calculus.'" Washington, 2022 WL 873315 at *5 (quoting Sizer v. State, 456 Md. 350, 367, 174 A.3d 326, 336 (2017)). The Court concluded that, in seeking reversal of the circuit court's denial of the motion to suppress, Washington asked the Court to diverge from the Supreme Court's decision in Wardlow and decisions

- 14 -

from this Court "upholding the proposition from *Wardlow* that unprovoked flight from law enforcement in a high-crime area can be grounds for the requisite reasonable suspicion to effectuate a *Terry* stop." Washington, 2022 WL 873315 at *5. The Court held that, "based on the totality of the circumstances, Detective Rodriguez had reasonable suspicion to stop Washington." Id.

Although the Appellate Court of Maryland concluded that reasonable suspicion for the stop existed, the Court discussed Washington's contention that African American people generally and young African American men in particular may have innocent reasons for fleeing police officers. See id. at *6. The Court acknowledged that there are "problematic implications in relying on 'unprovoked flight' due to the legitimate reasons that individuals might be wary of interactions with police in Baltimore City and elsewhere," that "some courts have highlighted the troubling relation of high-crime areas to areas that are simply majority-minority," and that, as a result, "the usefulness of relying on these factors as justifying reasonable suspicion might warrant further review." Id. at *7. That said, the Court pointed out that it was bound by our case law, under which "both unprovoked flight and presence in a high-crime area are relevant to a reasonable suspicion analysis, and together can amount to a finding of such." Id. at *8. In sum, addressing the federal constitutional issue, the Appellate Court of Maryland held that the stop did not violate Washington's rights under the Fourth Amendment because his unprovoked flight from the detectives in a high-crime area gave rise to reasonable articulable suspicion. See id. at *2.

Addressing the State constitutional issue, the Appellate Court of Maryland held that

the stop did not violate Washington's rights under Article 26 because the article does not afford more protection than the Fourth Amendment. See id. at *8. The Court reaffirmed the principle set forth in Maryland case law "that the protections in Article 26 are co-extensive with those afforded by the Fourth Amendment." Id. (cleaned up).

**Petition for a Writ of *Certiorari***

On May 11, 2022, Washington petitioned for a writ of *certiorari*, raising the following four issues:

> 1. In light of the legitimate reasons why young Black men may be afraid of interacting with the police, what weight, if any, should "unprovoked" flight from the police be given in the reasonable suspicion analysis?
>
> 2. Does flight from the Baltimore police by a young Black man in a high-crime area in Baltimore City give the police reasonable suspicion to make a *Terry* stop?
>
> 3. Did the [Appellate Court of Maryland] err by holding that the stop of Petitioner did not violate Petitioner's rights under the Fourth Amendment, despite recognizing the "problematic implications" of relying on flight from the police in the reasonable suspicion analysis?
>
> 4. Did the [Appellate Court of Maryland] err by holding that the stop of Petitioner did not violate Petitioner's rights under Article 26 of the Maryland Declaration of Rights, and, if so, does a violation of Article 26 require the exclusion of the illegally seized evidence?

On May 26, 2022, the State filed an answer to the petition and a conditional cross-petition, raising the following issue:

> Should Detective Israel Lopez's observation of a "bulge" in Washington's waistband and Detective Darwin Noesi's observation that Washington was "manipulating something at his front as he's running" be imputed to the arresting officer and considered in the reasonable suspicion analysis under the collective knowledge doctrine?

On July 8, 2022, we granted the petition and conditional cross-petition. See Washington

v. State, 479 Md. 456, 278 A.3d 761 (2022).

## DISCUSSION[7]

### I. Fourth Amendment

### The Parties' Contentions

Washington contends that his flight from the detectives did not give rise to reasonable articulable suspicion under the Fourth Amendment because people, especially young African American men, may flee from law enforcement officers out of reasonable fear of police violence rather than consciousness of guilt. Washington argues that the holding in Wardlow, 528 U.S. at 125, that "unprovoked flight" from officers may suggest wrongdoing, is outdated. Washington asserts that the Supreme Court's holding—which was premised on "commonsense judgments and inferences about human behavior[,]" id. (citation omitted)—failed to take into account the divergent experiences with police of people from different segments of society. Washington asserts that, today, there is increased public awareness that officers disproportionately kill African American people, especially young African American men. Accordingly, Washington maintains that "unprovoked flight" from officers deserves little weight as a factor in determining reasonable suspicion, because running from officers does not indicate wrongdoing any

---

[7]Questions 1, 2, and 3 of the petition for a writ of *certiorari* raise essentially the same issue and, as such, we will address the questions together. In its brief, the State argues that, even if we conclude that Washington's unprovoked, headlong flight in a high-crime area did not establish reasonable suspicion, observations of a bulge in Washington's waistband not communicated to Detective Rodriguez should be considered in the reasonable suspicion analysis under the "collective knowledge doctrine." As a result of our holding as to the questions raised by Washington, however, we need not address the State's question concerning the "collective knowledge doctrine."

- 17 -

more than it does fear for one's own safety.

Washington contends that such fear is especially pronounced in Baltimore City. Washington draws our attention to the death of Freddie Gray, Jr. in the custody of the Baltimore Police Department, the subsequent consent decree between the Baltimore Police Department and the Department of Justice, and the scandal surrounding the Gun Trace Task Force. Although Washington acknowledges that whether a stop occurs in a high-crime area is a factor to be considered under Wardlow, he argues that the factor is problematic because the assessment of whether an area is a high-crime area depends on an officer's subjective belief and can be based on the racial makeup and average income of the residents of the area.

The State responds that, under Wardlow and our later cases, unprovoked, headlong flight from officers in a high-crime area can establish reasonable suspicion. The State describes the term "headlong" as implying "that the defendant was not simply leaving the area in a reasonable manner to passively *avoid* the police and go about one's business, but, rather, the defendant was actively *evading* the police in a rapid, frantic, or suspicious manner." (Emphasis in original) (citations omitted). The State contends that such flight constitutes the suspicious act of evading officers, as opposed to the innocent act of merely passively avoiding officers and going about one's business. The State argues that, in any event, officers are not required to rule out innocent explanations for an individual's conduct. The State asserts that Wardlow is not outdated because unprovoked, headlong flight from officers has not become common among innocent people, such that flight still meets the low bar for reasonable suspicion. Further, the State contends that the continued

- 18 -

validity of <u>Wardlow</u> is reflected in Justice Stevens's opinion concurring in part and dissenting in part in <u>Wardlow</u>, which discussed the concerns that Washington raises. The State maintains that Washington's flight was unprovoked because it was not caused by anything more than the passive presence of officers. The State defends the use of the high-crime area factor in the analysis of reasonable suspicion as consistent with the record, which provides an objective basis for determining that the particular block in question had a high volume of drug and gun activity.

**Standard of Review**

When reviewing a trial court's denial of a motion to suppress, we are limited to information in the record of the suppression hearing and consider the facts found by the trial court in the light most favorable to the prevailing party, in this case, the State. <u>Trott v. State</u>, 473 Md. 245, 253-54, 249 A.3d 833, 838, <u>cert. denied</u>, ___ U.S. ___, 142 S. Ct. 240 (2021). We accept facts found by the trial court during the suppression hearing unless clearly erroneous. <u>See id.</u> at 254, 249 A.3d at 838. In contrast, our review of the trial court's application of law to the facts is *de novo*. <u>See id.</u> at 254, 249 A.3d at 838. In the event of a constitutional challenge, we conduct an "independent constitutional evaluation by reviewing the relevant law and applying it to the unique facts and circumstances of the case." <u>Id.</u> at 254, 249 A.3d at 838 (cleaned up).

**Analysis**

***Terry* Stops and Case Law**

The Fourth Amendment to the United States Constitution bars the government from subjecting people to "unreasonable searches and seizures[.]" U.S. Const. amend. IV. "For

the Fourth Amendment's purposes, a 'seizure' of a person is any nonconsensual detention." Norman v. State, 452 Md. 373, 386-87, 156 A.3d 940, 948 (2017) (citation omitted). "'The exclusion of evidence obtained in violation of these provisions is an essential part of the Fourth Amendment protections.'" Trott, 473 Md. at 254, 249 A.3d at 839 (quoting Swift v. State, 393 Md. 139, 149, 899 A.2d 867, 873 (2006)). "In determining whether a search or seizure is lawful, "[t]he touchstone of our analysis under the Fourth Amendment is always the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security." Id. at 254, 249 A.3d at 839 (cleaned up).

"Recognizing that the constitutional gauge for purposes of Fourth Amendment analysis is reasonableness[,]" id. at 254, 249 A.3d at 839, Terry, 392 U.S. at 30, permits an officer with reasonable suspicion "that criminal activity may be afoot" to briefly detain a person after observing "unusual conduct" in order to resolve the suspicion. In Terry, 392 U.S. at 21, the Supreme Court held that to establish reasonable suspicion, a "police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" the stop. The Supreme Court noted that there is nothing suspicious about standing together on a street corner, strolling up and down a street, or looking into store windows. See id. at 22-23. However, the particular manner and combination that the individuals in Terry engaged in these behaviors, coupled with the reasonable inferences which the officer was entitled to draw, were sufficient to establish reasonable suspicion for a stop. See id. at 24, 27. The Court indicated that this is a highly fact-specific inquiry, because "[e]ach case of this sort will, of course, have to be decided

- 20 -

on its own facts." Id. at 30.

The meaning of reasonable suspicion is not fixed, but "exists somewhere between unparticularized suspicions and probable cause." Sizer, 456 Md. at 364, 174 A.3d at 334. This fluidity is intentional because the standard "'is not readily, or even usefully, reduced to a neat set of legal rules.'" Trott, 473 Md. at 257, 249 A.3d at 840 (quoting United States v. Sokolow, 490 U.S. 1, 7 (1989)). Instead, we assess the existence of reasonable suspicion based on the totality of the circumstances, *i.e.*, the whole picture. See id. at 257, 249 A.3d at 840. This standard relies on a commonsense understanding of the "factual and practical aspects of daily life and how reasonable and prudent people act." Id. at 257, 249 A.3d at 840 (quoting Cartnail v. State, 359 Md. 272, 286, 753 A.2d 519, 527 (2000)) (internal quotation marks omitted). The "touchstone" of this analysis is reasonableness, both of the circumstances surrounding a stop and the nature of the stop itself. Id. at 254-55, 249 A.3d at 839 (quoting Pennsylvania v. Mimms, 434 U.S. 106, 108-09 (1977)).

Because it requires a lower standard than probable cause, reasonable suspicion can be based on "information that is different in quantity or content" and "less reliable than that required to show probable cause." In re D.D., 479 Md. 206, 231, 277 A.3d 949, 963-64 (2022) (quoting Alabama v. White, 496 U.S. 325, 330 (1990)) (internal quotation marks omitted). That is because reasonable suspicion is a lower standard than probable cause, as it permits the lesser intrusion of a stop, and perhaps a frisk, rather than an arrest. See Trott, 473 Md. at 255, 249 A.3d at 839. But this does not permit police "to simply assert that innocent conduct was suspicious[.]" Id. at 257, 249 A.3d at 840 (quoting Sizer, 456 Md. at 365, 174 A.3d. at 334). Rather, there must exist a particularized, objective basis for how

the observed conduct, in the context "known to the officer, was indicative of criminal activity." Id. at 257, 249 A.3d at 840 (quoting Sizer, 456 Md. at 365, 174 A.3d at 334) (internal quotation marks omitted). A hunch or general suspicion is not enough, but reasonable suspicion can be supported by circumstances and conduct that, viewed alone, appear innocent yet "collectively warrant further investigation." Id. at 257, 249 A.3d at 840 (quoting Cartnail, 359 Md. at 290, 753 A.2d at 529 (cleaned up)). However, if individual factors appear innocent, when "viewed in their totality" they must be "more indicative of criminal activity than any one factor assessed individually." Crosby v. State, 408 Md. 490, 511, 970 A.2d 894, 906 (2009) (citing Cartnail, 359 Md. at 293-94, 753 A.2d at 531). In the totality of the circumstances analysis, we avoid "a 'divide and conquer' approach to addressing factors" that could support or undermine a finding of reasonable suspicion. Id. at 510, 970 A.2d at 905 (quoting Arvizu, 534 U.S. at 274).

In Trott, 473 Md. at 265, 249 A.3d at 845, we held that an anonymous 911 call about a drunk driver formed part of the totality of the circumstances establishing that "the police officers had a particularized and objective basis for suspecting ongoing criminal activity[,]" thereby permitting a stop. We held that the 911 call "provided sufficient indicia of reliability" because it was "contemporaneous to the reported behavior and provided detailed and specific information" about the color of the pertinent vehicle and its license plate and registration numbers. Id. at 265-66, 249 A.3d at 845. We found further indicia of reliability in the caller's use of the 911 system, which can record calls, and the existence of penalties for false reporting. See id. at 267, 249 A.3d at 846. Additional facts supporting our holding included the vehicle being parked outside a liquor store at 11:30 p.m., which

- 22 -

permitted an inference that the driver may have been consuming alcohol. See id. at 267, 249 A.3d at 846. We noted that, in isolation, these facts could be innocent, but that a finding of reasonable suspicion "need not rule out the possibility of innocent conduct." Id. at 268, 249 A.3d 846-47 (quoting Arvizu, 534 U.S. at 277) (internal quotation marks omitted). The relatively unintrusive nature of the stop—a tap on the vehicle window and brief conversation—and the severity of the risk of public harm from drunk driving further supported the existence of reasonable suspicion. See id. at 269-70, 249 A.3d at 847-48.

Just as the totality of the circumstances can place otherwise innocent conduct in a different light, sometimes the circumstances are insufficient to justify a Terry stop, as in Cartnail, 359 Md. at 289, 753 A.2d at 528-29. In Cartnail, a report of an early morning armed robbery of a business at the interchange of four highways was accompanied by a description of the assailants as three African American men who fled in a gold or tan Mazda. See id. at 277, 753 A.2d 522. Based solely on this description, police stopped the petitioner, an African American man, with a passenger of the same race and gender in a gold Nissan, over an hour later in a nearby part of the same town and arrested him for driving with a revoked license. See id. at 277-78, 753 A.2d at 522. We were "struck by the lack of corroboration between the description of the robbery suspects and the circumstances surrounding Petitioner at the time of the stop." Id. at 290, 753 A.2d at 529. We held that even in the sparsely populated streets on an early weekday morning, the tenuous connection between the description of the robbers and the petitioner's circumstances could not support reasonable suspicion, because of the different makes of the vehicles, the lack of any suspicious conduct, and the length of time that had passed.

- 23 -

See id. at 282, 293-96, 753 A.2d at 524, 530-32.  Critical to our conclusion was that the facts allegedly supporting reasonable suspicion—race, gender, and number of the vehicle's occupants, color and make of the vehicle, and physical proximity to the crime—did not "serve to eliminate a substantial portion of innocent travelers" such that "the requirement of reasonable suspicion" was satisfied.  Id. at 291, 753 A.2d at 530 (quoting Ferris v. State, 355 Md. 356, 387, 735 A.2d 491, 507 (1999)).

In Whren v. United States, 517 U.S. 806, 813 (1996), the Supreme Court held that when assessing the constitutionality of a police officer's stop of an individual or vehicle, the actual motivations of the officers involved are irrelevant.  Plainclothes officers in the District of Columbia were patrolling a "high drug area" in an unmarked car when they saw a truck make a turn without using a signal and speed off after sitting at a stop sign for an "unusually long time[.]"  Id. at 808.  When an officer approached the truck at a stoplight to instruct the driver to put the vehicle in park, he saw one of the occupants holding large bags of what appeared to be crack cocaine.  See id. at 808-09.  The driver and passenger were arrested and convicted on drug charges after the trial court denied their motion to suppress the drugs seized.  See id. at 809.  The Supreme Court declined to adopt the defendants' proposed modification of the objective reasonable officer standard, which was designed to preclude the perceived danger of pretextual stops based on race, among other things.  See id. at 811-14.  Characterizing the proposed standard as requiring the court to ask whether "it is plausible to believe that the officer had the proper state of mind[,]" the Supreme Court determined that this was a subjective test and impractical because of the variation of police practices among localities.  Id. at 814-15.

## *Illinois v. Wardlow*

In Wardlow, 528 U.S. at 121, the Supreme Court held that officers in that case had reasonable suspicion to stop the defendant, who fled upon seeing them in an area known for heavy drug trafficking. In Wardlow, id. at 121-22, the defendant looked in the direction of uniformed officers in a vehicle as they drove by him and fled. The officers followed the defendant, who ran through a gangway and an alley, until they cornered him. See Wardlow, 528 U.S. at 122. In the course of a protective pat-down for weapons, one officer recovered a handgun from the bag the defendant carried. See id.

The trial court denied the defendant's motion to suppress the gun as recovered in violation of the Fourth Amendment. See id. Wardlow was convicted, but an Illinois appellate court reversed, concluding that the gun should have been suppressed because the officer lacked reasonable suspicion to justify a Terry stop. See Wardlow, 528 U.S. at 122. The Illinois Supreme Court agreed that the officer lacked reasonable suspicion, but on different grounds. See id. The Illinois Supreme Court concluded that the defendant was in a high-crime area, but flight in such an area was not enough to support reasonable suspicion. See id. The defendant's flight was of little probative value to the Illinois Supreme Court, which concluded that it fell within a person's Fourth Amendment right to decline to interact with police and "'go on one's way.'" See id. at 122-23 (citation omitted). Therefore, the Illinois Supreme Court held, the flight in a high-crime area did not create reasonable suspicion, making the stop a violation of the Fourth Amendment. See id. at 123.

The Supreme Court reversed. See id. According to the Supreme Court, the case

was governed by the analysis from Terry and its progeny. See Wardlow, 528 U.S. at 123. Applying this analysis, the Supreme Court observed that it had previously concluded that, in assessing whether reasonable suspicion justified a stop, a court may consider the circumstances that the stop occurs in a high-crime area and that the defendant engaged in nervous, evasive behavior. See id. at 124. The Supreme Court determined that "[h]eadlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." Id. The Supreme Court pointed out that, "[i]n reviewing the propriety of an officer's conduct, courts do not have available empirical studies dealing with inferences drawn from suspicious behavior, and we cannot reasonably demand scientific certainty from judges or law enforcement officers where none exists." Id. at 124-25. The Supreme Court explained that, accordingly, "the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior." Id. at 125 (citation omitted).

The Supreme Court recognized that it had previously held that, by itself, a refusal to cooperate with officers does not give rise to reasonable suspicion. See id. Reaffirming its precedent that "when an officer, without reasonable suspicion or probable cause, approaches an individual, the individual has a right to ignore the police and go about his business," the Supreme Court found no conflict between this concept and the use of unprovoked flight as a factor supporting reasonable suspicion. Id. (citing Florida v. Royer, 460 U.S. 491, 498 (1983)). The Supreme Court determined, however, that "unprovoked flight is simply not a mere refusal to cooperate. Flight, by its very nature, is not 'going about one's business'; in fact, it is just the opposite." Id. The Supreme Court explained

- 26 -

that "[a]llowing officers confronted with such flight to stop the fugitive and investigate further is quite consistent with the individual's right to go about his business or to stay put and remain silent in the face of police questioning." Id.

The Supreme Court agreed with the defendant and *amici* "that there are innocent reasons for flight from police and that, therefore, flight is not necessarily indicative of ongoing criminal activity." Id. The Supreme Court concluded, however, that in Wardlow, such potential innocent reasons were insufficient to establish a violation of the Fourth Amendment. See id. The Supreme Court explained that "*Terry* accepts the risk that officers may stop innocent people." Wardlow, 528 U.S. at 126. Normally, this "minimal intrusion" leaves the person free to leave if no further incriminating facts result from the brief investigation; the Supreme Court observed, though, that "officers found respondent in possession of a handgun," resulting in arrest. Id.

In Wardlow, the Supreme Court did not relieve trial courts of the obligation to perform the totality of the circumstances analysis. In its opinion, the Supreme Court repeatedly emphasized the various "pertinent factor[s]" and "contextual considerations" that a court must assess in determining whether reasonable suspicion exists. Id. at 124.

In an opinion concurring in part and dissenting in part that Justices Souter, Ginsburg, and Breyer joined, Justice Stevens agreed with the majority's decision not to endorse either of the *per se* rules that the parties advanced but disagreed with the majority that the officers had reasonable suspicion. See id. at 126-27 (Stevens, J., concurring in part and dissenting in part). Justice Stevens noted that the State of Illinois had requested a bright-line rule that officers may stop anyone who flees from them, whereas the defendant had asked for a

holding that, by itself, unprovoked flight from officers cannot justify a stop. See id. at 126 (Stevens, J., concurring in part and dissenting in part). Justice Stevens opined that neither *per se* rule was warranted because the term "'[u]nprovoked flight[]' . . . describes a category of activity too broad and varied to permit a *per se* reasonable inference regarding the motivation for the activity." Id. at 136 (Stevens, J., concurring in part and dissenting in part). Justice Stevens pointed out that "there are unquestionably circumstances in which a person's flight is suspicious, and undeniably instances in which a person runs for entirely innocent reasons." Id. at 129 (Stevens, J., concurring in part and dissenting in part) (footnote omitted).

By way of illustration, Justice Stevens observed that, "[a]mong some citizens, particularly minorities and those residing in high crime areas, there is [] the possibility that the fleeing person is entirely innocent, but, with or without justification, believes that contact with the police can itself be dangerous, apart from any criminal activity associated with the officer's sudden presence." Id. at 132 (Stevens, J., concurring in part and dissenting in part) (footnote omitted). Justice Stevens stated that, "[f]or such a person, unprovoked flight is neither 'aberrant' nor 'abnormal.' Moreover, these concerns and fears are known to the police officers themselves, and are validated by law enforcement investigations into their own practices." Id. at 132-33 (Stevens, J., concurring in part and dissenting in part) (footnotes omitted). Justice Stevens opined that, "[a]ccordingly, the evidence supporting the reasonableness of these beliefs is too pervasive to be dismissed as random or rare, and too persuasive to be disparaged as inconclusive or insufficient." Id. at 133-34 (Stevens, J., concurring in part and dissenting in part) (footnote omitted). That

said, Justice Stevens stated that, "just as we do not require 'scientific certainty' for our commonsense conclusion that unprovoked flight can sometimes indicate suspicious motives, neither do we require scientific certainty to conclude that unprovoked flight can occur for other, innocent reasons." Id. at 135 (Stevens, J., concurring in part and dissenting in part) (quoting Wardlow, 528 U.S. at 125) (footnote omitted).

Accordingly, Justice Stevens explained, "[t]he probative force of the inferences to be drawn from flight is a function of the varied circumstances in which it occurs." Id. at 135 (Stevens, J., concurring in part and dissenting in part). Justice Stevens stated that this case-by-case analysis means that the inference from unprovoked flight will sometimes be "consistent with the presumption of innocence, sometimes [] justify further investigation, and sometimes [] justify an immediate stop[.]" Id. (Stevens, J., concurring in part and dissenting in part). Justice Stevens outlined several factors that could affect the inference to be drawn from unprovoked flight from police: "the time of day, the number of people in the area, the character of the neighborhood, whether the officer was in uniform, the way the runner was dressed, the direction and speed of the flight, and whether the person's behavior was otherwise unusual[.]" Id. at 129-30 (Stevens, J., concurring in part and dissenting in part).

Applying the totality of the circumstances analysis, Justice Stevens, unlike the majority, found the facts insufficient to support reasonable suspicion. See id. at 137 (Stevens, J., concurring in part and dissenting in part). For Justice Stevens, the officer testimony was brief and not very informative, leading to a conclusion that the defendant's flight was not indicative of criminal activity. See id. at 137-39 (Stevens, J., concurring in

part and dissenting in part).

With our holding in this case, we do not overrule or abrogate <u>Wardlow</u>'s application in Maryland. Supreme Court case law binds us, and we follow it. That said, we apply the Supreme Court's holding in <u>Wardlow</u> as the language in the majority opinion and Justice Stevens's opinion indicates it was intended to be applied: as a fact-based analysis of the totality of the circumstances, not a *per se* rule that unprovoked flight in a high-crime area always establishes reasonable suspicion. Indeed, that is how we have consistently applied <u>Wardlow</u> over the past two decades.

### *Maryland Case Law after <u>Wardlow</u>*

In <u>Bost v. State</u>, 406 Md. 341, 344-45, 958 A.2d 356, 358 (2008), we held that police officers in the District of Columbia had reasonable suspicion to believe that the defendant had committed a felony and that, accordingly, the officers did not violate the Maryland Uniform Act on Fresh Pursuit, under which a member of a law enforcement unit of another jurisdiction who enters Maryland in fresh pursuit of a person believed to have committed a felony in the other jurisdiction may arrest the person. <u>See</u> Md. Code Ann., Crim. Proc. (2001, 2018 Repl. Vol.) § 2-305(a). The officers, identified as police by their jackets, approached a group of people who were drinking alcohol on a sidewalk in a high-crime area in the District of Columbia near the border with Maryland. <u>See</u> <u>Bost</u>, 406 Md. at 346, 958 A.2d at 359. The defendant left the group, walking briskly and clutching the right side of his waistband. <u>See</u> <u>id.</u> at 346, 958 A.2d at 359. Afterward, the defendant fled, and the officers chased him into Prince George's County, stopped him, and found a pistol on him. <u>See</u> <u>id.</u> at 346, 958 A.2d at 359. We observed that it is a felony to carry a pistol without a

- 30 -

license in the District of Columbia. See id. at 359, 958 A.2d at 367. We determined that the officers had reasonable suspicion to believe that the defendant possessed a gun because the defendant appeared to be clutching something at his waistband and engaged in unprovoked flight from officers in a high-crime area known for drug trafficking. See id. at 359-60, 958 A.2d at 367.

In Sizer, 456 Md. at 374-75, 174 A.3d at 340, we held that officers had reasonable suspicion to stop the defendant, who fled after the officers approached a group of people who had been drinking alcohol in a parking lot, one of whom had thrown a bottle on the ground. We held that the trial court had erred in failing to undertake a totality of the circumstances analysis by determining that the defendant's flight alone was not sufficient to establish probable cause. See id. at 361, 370, 174 A.3d at 332, 337. We observed that littering and consuming an alcoholic beverage in a parking lot are misdemeanors under State and local law, which the trial court had failed to take into account. See id. at 371-72, 174 A.3d at 338-39. We determined that the defendant's "flight from the group as the officers approached to investigate probable crimes committed in their presence shifted their focus to [the defendant], which could have reasonably heightened their suspicion that he was the individual responsible for throwing the bottle." Id. at 372, 174 A.3d at 339. In other words, we explained that the defendant's "flight obviously drew the officers' attention and intensified the officers' investigation by shifting their focus from the group to him as an individual." Id. at 372, 174 A.3d at 339. Although the officers characterized the area as a high-crime area, we did not take that testimony into account, noting that the officers did not "testify that they observed the group demonstrating behavior consistent

- 31 -

with the nature of the crimes that led them to conclude that the" area was a high-crime area. Id. at 358, 371, 174 A.3d at 330, 338.

To the extent that any language in the above cases indicates that Wardlow stands for the proposition that unprovoked flight in a high-crime area is automatically sufficient to establish reasonable suspicion for a Terry stop, this is an overreading of our case law and of the Supreme Court's holding in Wardlow. Our language may have been somewhat imprecise in Bost, 406 Md. at 358, 958 A.2d at 366, when we stated that the Supreme Court "made clear that unprovoked flight is enough to support reasonable suspicion that a crime has been committed." (Citing Wardlow, 528 U.S. at 124). Instead, the Supreme Court held in Wardlow that unprovoked flight is one factor that may support a finding of reasonable suspicion in combination with other circumstances—the Supreme Court has never held that unprovoked flight standing alone is sufficient to establish reasonable suspicion. Significantly, the broadly worded statement in Bost was not the basis for our reasonable suspicion conclusion. We concluded that reasonable suspicion existed in Bost based on the combination of the defendant's flight, the high-crime area, and the officers' observation that the defendant was clutching what they suspected was an illegal firearm. See Bost, 406 Md. at 359-60, 958 A.2d at 367.

Similarly, in Sizer, 456 Md. at 370, 174 A.3d at 337, our analysis focused on the totality of the circumstances. We were unpersuaded by the trial court's reliance on the defendant's flight as a dispositive factor. See id. at 370, 174 A.3d at 337. We described Wardlow as addressing "the weight to be given unprovoked flight in a high crime area as one factor in the totality of the circumstances analysis." Sizer, at 367, 174 A.3d at 336

(citation omitted).  Indeed, we held that, under a totality of the circumstances analysis, "an individual's unprovoked flight or presence in a high crime area, or both, are individual factors that may contribute to the reasonable suspicion calculus."  Id. at 367, 174 A.3d at 335-36 (citation omitted).  Because these are factors that may support reasonable suspicion and are not "hard certainties," it stands to reason that there can be times when unprovoked flight in a high-crime area does not "contribute to the . . . calculus."  Id. at 367, 174 A.3d at 335-36 (cleaned up).

### Fear of Law Enforcement Officers

### In general

We have carefully considered the arguments raised by Washington and *amici* and decline to establish a hard-and-fast rule that unprovoked flight from police officers in a high-crime area is always insufficient to establish reasonable suspicion for a Terry stop.  Washington contends that finding unprovoked flight from the police while in a high-crime area to be a sufficient basis to establish reasonable suspicion is outdated and does not reflect the life experience of all people.  More specifically, he argues that the inference that such flight is suggestive of guilt is inconsistent with legitimate reasons for innocent people, particularly young African American men, to flee from police.  Washington states that African American people are disproportionately victims of police violence and are killed by police more than twice as often as their white peers.  According to Washington, young African American men and boys are especially at risk.  Washington asserts that African American "people are also disproportionately likely to be stopped, searched, and arrested by the police, and are more likely to be the subject of use of force."  (Citation omitted).

- 33 -

In addition, Washington states that "constant exposure to images of racialized police violence—usually, graphic videos—amplifies fear of the police." Washington contends that images and footage from cell phones and body-worn cameras shared via news outlets and social media make police violence against African American people hyper-visible. Washington maintains that the fear of police is documented among African American people and is a natural reaction. Accordingly, Washington argues that, taking these circumstances into account, flight from police should be accorded less weight in the reasonable suspicion analysis unless accompanied by other facts showing consciousness of guilt.

### In Baltimore City

Washington contends that in Baltimore City it is especially reasonable to fear police officers due to the city's history of police discrimination, excessive force, and other misconduct. Washington links the death of Freddie Gray, Jr. to the history of police misconduct in the city, documented subsequently by the Department of Justice investigation into the Baltimore Police Department in 2015 and 2016. Washington observes that the Department of Justice investigation concluded that "Baltimore police engaged in a pattern or practice of making unconstitutional stops, searches, and arrests, discriminating against Black people in their enforcement activities, and using unreasonable force." (Citation omitted). Washington cites the investigation's findings that the Baltimore Police Department routinely "uses overly aggressive tactics that unnecessarily escalate encounters, increase tensions, and lead to unnecessary force" and "uses unreasonable force against people who present little or no threat to officers or others." (Citation omitted).

Washington also notes that the Baltimore Police Department has entered into a consent decree with the Department of Justice to address the problems documented in the investigation.

Washington points to the indictment of members of the Gun Trace Task Force as an example of the basis for fear that African American people in Baltimore have of police. Washington states that eight officers of the Gun Trace Task Force were charged under conspiracy and racketeering laws because the Task Force for years had been "conducting illegal searches, planting evidence such as guns and drugs, lying in sworn paperwork, and committing robberies and extortion—and worse." (Footnotes omitted). Washington points out that the Gun Trace Task Force scandal, the Department of Justice investigation, and Freddie Gray, Jr.'s death received widespread attention in Baltimore, which he contends further affirmed fear of the police among some city residents, particularly African American residents.[8]

We have reviewed and considered Washington's arguments with care and do not take lightly his contentions. We are aware that the Supreme Court has recognized that the totality of the circumstances analysis includes "information that is accessible to people

---

[8]We received two *amici curiae* briefs from groups in support of Washington's position. One group of *amici* notes that Washington's brief provides a detailed recounting of incidents concerning the Baltimore Police Department that were covered by the media. *Amici* contend, among other things, that Washington's flight was "a reasonable effort to avoid contact with members of the same [police department] reported to have framed, robbed, and assaulted people who look like him." The second group of *amici* argues, among other things, that "Washington's flight from Baltimore City police officers patrolling his neighborhood must be understood against the backdrop of the Baltimore Police Department's institutionalized and historical police corruption and violence toward persons of color." (Bolding omitted).

generally," whether members of the public or police officers. <u>Kansas v. Glover</u>, ___ U.S. ___, 140 S. Ct. 1183, 1189-90 (2020). Such information may include the particular history of police misconduct in Baltimore. This reality is part of the "factual and practical aspects of daily life" for all people. <u>Trott</u>, 473 Md. at 257, 249 A.3d at 840 (quoting <u>Cartnail</u>, 359 Md. at 286, 753 A.2d at 527). As a result, we reiterate that the circumstance that unprovoked flight may be consistent with innocence is a factor that a court may take into account in determining whether officers had reasonable suspicion to detain a person, particularly a young African American man, such as Washington. In other words, the circumstance that people, particularly young African American men, may flee police for innocent reasons may be considered in the Fourth Amendment reasonable suspicion calculus.

### *No Bright-Line Rule*

With all of the above having been considered, we do not establish a bright-line rule that unprovoked flight from police officers in a high-crime area by any person or a person who is a member of any group is a factor that may never give rise to reasonable suspicion. Nor do we establish a *per se* rule that unprovoked flight in a high-crime area will always equal reasonable suspicion. Rather, unprovoked flight is a factor to be considered and the circumstance that flight may have occurred for innocent reasons, such as fear of police officers, may be considered.

Whether unprovoked flight is to be considered a factor weighing in favor of reasonable suspicion and what weight to give it as a factor are factual determinations to be made on a case-by-case basis by the trial court. Although there is undoubtedly an increased

awareness of police misconduct involving race-based violence, which may amplify fear of police officers in the African American community and in other communities, it is still as accurate today as it was when the Supreme Court issued <u>Wardlow</u> in 2000 that people flee from police officers for reasons associated with involvement in criminal activity. That has not changed. With this reality, we cannot establish a bright-line rule that eliminates unprovoked flight as a factor in the reasonable suspicion analysis. Instead, we reaffirm our commitment to the totality of the circumstances analysis.[9]

Our holding applies not only to Baltimore City but also to all jurisdictions in Maryland. However, a court may give greater or lesser weight to the innocent reasons for flight based on where the incident occurs, because "[i]t is settled that the nature of the area is a factor in assessing reasonable suspicion." <u>Holt v. State</u>, 435 Md. 443, 466, 78 A.3d 415, 428 (2013) (cleaned up).

### *High-Crime Areas*

The State contends that Washington's arguments regarding the high-crime area

---

[9]In reaffirming our commitment to the totality of the circumstances test and that, as part of the analysis, a court may consider whether unprovoked flight is consistent with innocence, we do not abandon the concept that the standard by which reasonable suspicion is determined is an objective one. In the totality of the circumstances assessment, "it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search warrant a man of reasonable caution in the belief that the action taken was appropriate?" <u>Terry</u>, 392 U.S. at 21-22 (cleaned up). As we stated in <u>Sellman v. State</u>, 449 Md. 526, 542, 144 A.3d 771, 781 (2016), the totality of the circumstances "test is objective: the validity of the stop or the frisk is not determined by the subjective or articulated reasons of the officer; rather, the validity of the stop or frisk is determined by whether the record discloses articulable objective facts to support the stop or frisk." (Cleaned up). As such, the totality of the circumstances assessment to determine the existence of reasonable articulable suspicion is and remains an objective test.

factor of the reasonable suspicion analysis—namely, Washington's argument that the label "high-crime area" is used by police officers as a "proxy for race and caste"—are not preserved as the arguments were not raised in the circuit court, the Appellate Court of Maryland, or the petition for a writ of *certiorari*. First, the State oversimplifies Washington's argument. On brief in this Court, Washington contends that relying on a person's presence in a high-crime area as a factor to evaluate reasonable suspicion is problematic because "there is no standard for what constitutes a 'high-crime area,' either with respect to the measure of the level of crime relative to that elsewhere, with respect to what types of crime are significant, or with respect to limitations on the scope of the geographic area."

Next, the State has the burden to demonstrate that an officer has reasonable articulable suspicion for a stop. See State v. Carter, 472 Md. 36, 55, 244 A.3d 1041, 1052 (2021). Warrantless searches and seizures are presumptively *per se* unreasonable under the Fourth Amendment and the burden is on the State to provide justification for the departure from the warrant requirement. See id. at 55, 244 A.3d at 1052. To the extent that a location is alleged to be a high-crime area and this is a factor purported to support a Terry stop, the State has the burden to establish that this is so. In this case, Washington has preserved a challenge as to whether the State has done so.

In Maryland, we have not had occasion to explore the intricacies of what constitutes a high-crime area. Of course, we follow the precedent of Wardlow, 528 U.S. at 124, that when a stop occurs in a high-crime area, the location is "among the relevant contextual considerations in a Terry analysis." Sizer 456 Md. at 368, 174 A.3d at 336. Further, the

- 38 -

description of an area as a high-crime area must be based on objective and specific facts, like any factor in the totality of the circumstances analysis. See id. at 366, 174 A.3d at 335.

In Sizer, id. at 356, 358, 374-75, 174 A.3d at 329-30, 340, we reversed the trial court's determination that officers did not have reasonable suspicion to stop the defendant after he fled as officers approached a group of people who had been drinking alcohol in a parking lot near the Owen Brown Village Center, one of whom had thrown a bottle on the ground. The State's argument for reasonable suspicion rested, in part, on the contention that the defendant was stopped in a high-crime area. See id. at 358, 174 A.3d at 330. At the suppression hearing, two officers testified that the Owen Brown Village Center was a "'high' or 'higher crime area'" due to high rates of calls for service. Id. at 359, 174 A.3d at 330-31. Officers also testified that recently there had been a series of robberies at the Owen Brown Village Center and a report, the day before the stop of defendant, of a person wielding a handgun in the area leading up to the Owen Brown Village Center. See id. at 358-59, 174 A.3d at 331. "None of the officers testified that they believed the group was connected to the 'ongoing robbery series,' or that they suspected any member of the group was the individual who had displayed a gun on the previous night." Id. at 360, 174 A.3d at 332.

We expressed skepticism that the defendant was in a high-crime area, but did not make a determination on the issue because we saw the misdemeanors committed in the presence of the officers in combination with the defendant's flight as sufficient to provide reasonable suspicion. See id. at 371, 174 A.3d at 338. We noted the lack of evidence at the suppression hearing to establish that the parking lot where the defendant and the group

stood "was located in the Owen Brown Village Center" or the parking lot's proximity "to the Owen Brown Village Center or the area where the handgun violation had occurred." Id. at 370, 174 A.3d at 337-38. Rather, we stated that one officer had testified that the parking lot was not part of the Owen Brown Village Center and that he had observed a person in the defendant's group who was banned from the Owen Brown Village Center and watched to see whether the individual attempted to enter the location that he was banned from. See id. at 370, 174 A.3d at 338. We explained that this would support an inference that the parking lot was not in the Owen Brown Village Center, the high-crime area in question. See id. at 370, 174 A.3d at 338. Nor did we see any evidence linking the defendant or his group, specifically or generally, to the Owen Brown Village Center. See id. at 370-71, 174 A.3d at 338.

We found significant the fact that the officers did not testify "that they observed the group demonstrating behavior consistent with the nature of the crimes that led them to conclude that the Village Center was a high crime area." Id. at 371, 174 A.3d at 338. Our skepticism was heightened by the fact that none of the officers testified that they suspected the group or defendant of being connected to the handgun report and that no testimony established the proximity of the location associated with the handgun report to the group and defendant's location. See id. at 371, 174 A.3d at 338.

In a separate opinion, the Honorable Sally D. Adkins delved further into our precedent on high-crime areas:

> Whether an activity occurs in a high crime area can inform a police officer's analysis about the activity that is taking place. *Bailey v. State*, 412 Md. 349, 383-84, 987 A.2d 72 (2010). A suspect need not be connected to previous

crimes in the area, *Holt v. State*, 435 Md. 443, 466, 78 A.3d 415 (2013), but the nature of the area is relevant to reasonable suspicion when the suspect's activities appear to be the kind of criminal activity that is **likely** to be occurring there. A generalized description of an area as "high crime," without a greater connection to the observed activities, does not support reasonable suspicion. *See Bailey*, 412 Md. at 384, 987 A.2d 72. Other Maryland cases addressing *Terry* stops in high crime areas demonstrate that the nexus between the nature of the area and the observed activities is significant in determining whether officers had reasonable suspicion. *See Chase v. State*, 449 Md. 283, 289, 144 A.3d 630 (2016) (detaining individuals for suspicion of drug trafficking based on behavior in area known for drug trafficking); *Cox v. State*, 161 Md. App. 654, 671-74, 871 A.2d 647 (2005) (individual suspected of drug dealing had been warned away from intersection known for heroin trafficking earlier, when officers saw him again, he fled, committing a traffic infraction); *Wise v. State*, 132 Md. App. 127, 134, 751 A.2d 24 (2000) (suspect's actions in neighborhood known for drug trafficking coupled with flight after seeing officers justified investigatory detention).

Sizer, 456 Md. at 380-81, 174 A.3d at 343-44 (Adkins, J., concurring and dissenting) (emphasis in original). Judge Adkins related three factors used by federal appellate courts to assist in assessing whether areas are high-crime and their relation to reasonable suspicion under Wardlow and Terry, as set forth in United States v. Wright, 485 F.3d 45, 53-54 (1st Cir. 2007). See Sizer, 456 Md. at 381, 174 A.3d at 344 (Adkins, J., concurring and dissenting). A court considers "the nexus between the type of crime most prevalent or common in the area and the type of crime suspected in the instant case"; the "limited geographic boundaries of the area"; and the "temporal proximity between evidence of heightened criminal activity and the date of the stop or search at issue[.]" Id. at 381, 174 A.3d at 344 (Adkins, J., concurring and dissenting) (cleaned up). Judge Adkins applied these factors to conclude that, in Sizer, the State failed to prove that the Owen Brown Village Center was a high-crime area. See Sizer, 456 Md. at 381, 174 A.3d at 345 (Adkins,

J., concurring and dissenting).  For Judge Adkins, this was a conclusion that the majority "seem[ed] poised to reach, but then abandon[ed]."  Id. at 381, 174 A.3d at 344 (Adkins, J., concurring and dissenting) (footnote omitted).  "Increased calls for service and concerned business owners[,]" as described in officer testimony, were insufficient to support a conclusion that the area was a high-crime area.  Id. at 381-82, 174 A.3d at 344 (Adkins, J., concurring and dissenting) (footnote omitted).  Judge Adkins concluded that the "series of robberies at unknown locations and times" and the handgun report were not specific enough to establish that the defendant was in a high-crime area.  Id. at 382, 174 A.3d at 344 (Adkins, J., concurring and dissenting).  Echoing the majority's observation that the defendant and group were not "demonstrating behavior consistent with the nature of the crimes that led [police] to conclude that" the Owen Brown Village Center was a high-crime area, id. at 371, 174 A.3d at 338, Judge Adkins concluded that, even if the area were high-crime, without a nexus between the other crimes and the activity arousing the officers' suspicion, the high-crime area was not relevant to the reasonable suspicion analysis, see id. at 382, 174 A.3d at 344-45 (Adkins, J., concurring and dissenting).

Our cases involving police stops of individuals in high-crime areas have usually been more like Bost, 406 Md. at 359-60, 958 A.2d at 367,[10] in which we held that police

_____

[10]For example, in Bailey v. State, 412 Md. 349, 359, 361, 383-84, 987 A.2d 72, 78-79, 93 (2010), a case in which the trial court "gave 'great weight' to the fact that the petitioner was standing in a high drug crime area, where the police had received 'a number of complaints from citizens'" based on the testimony of the apprehending police officer, we acknowledged "the fact that activity is taking place in a high drug crime area can inform the police officer's analysis about the nature of activity taking place[,]" although we reversed the trial court's judgment because the defendant's presence in a high-crime area,

officers in the District of Columbia had reasonable suspicion to believe that the defendant had committed a felony based on his unprovoked flight from police in a high-crime area while clutching what officers suspected was a handgun. The trial court described the area where the incident occurred as "a drug trafficking area known to the police department in the District of Columbia." Bost, 406 Md. at 347, 958 A.2d at 359. Various officers testified that they were patrolling on the block where they encountered the defendant "as part of a Focus Mission Unit targeting street level narcotics and firearm recovery in high crime areas." Id. at 346, 958 A.2d at 359. More critical to our analysis was that the defendant had fled police, while appearing to try to conceal a weapon in his waistband. See id. at 360, 958 A.2d at 367. The dissent in Bost, id. at 365-66, 958 A.2d at 370-71 (Bell, C.J., dissenting), expressed skepticism about the "buzzword[]" "high crime area," but focused on the lack of reasonable suspicion that the defendant was involved in felonious criminal activity, as required under the statute in question, rather than more generalized wrongdoing.

Our case law supports the conclusion that testimony from police officers concerning a location being a high-crime area has been sufficient to allow a trial court to consider the high-crime nature of the location in determining the existence of reasonable suspicion for a stop. That we have not had occasion to more fully develop the necessary level of specificity of such testimony appears to result from lack of contention over a given area's high-crime status.

In Mayo v. United States, 266 A.3d 244, 250 (D.C. 2022), a case relied upon by

---

smelling of ether, a legal substance associated with PCP, and his failure to respond to an officer did not create probable cause for arrest. (Citing Arvizu, 534 U.S. at 274).

Washington, a court in another judication discussed the significance of a police officer's testimony concerning a high-crime area in conducting a reasonable suspicion analysis. The District of Columbia Court of Appeals held that officers lacked reasonable suspicion for a stop and concluded that an officer's testimony about a high-crime area did not add much value to the analysis. See Mayo, 266 A.3d at 250, 267. The testimony referred to an area by name as a high-crime area, but there was no testimony with respect to the area's boundaries and no details regarding the nature or quantity of alleged drug activity and no details about how guns had been detected or recovered. See id. at 267-68. The District of Columbia Court of Appeals upheld the trial court's assessment of the officer's testimony as "conclusory" and "lacking specificity[.]" Id. at 267.[11]

In this case, however, testimony from the detectives, who were familiar with the area, was particularized and specific in a way that the testimony in Mayo was not. The testimony of Detective Lopez was particularly specific, given that he described the area as "[v]ery violent" and testified that he had handled "a couple of homicide shootings and

---

[11]On October 27, 2022, a week before oral argument in this case, the District of Columbia Court of Appeals granted the government's petition for rehearing *en banc* in Mayo and vacated the opinion in the case. See Landon R. Mayo v. United States, No. 18-CF-1132, ___ A.3d ___, 2022 WL 16646150, at *1 (D.C. Oct. 27, 2022). We are unable to discern the specific reasons for which the District of Columbia Court of Appeals granted a rehearing *en banc*. However, in dissent, one member of the three-judge panel in Mayo, 266 A.3d at 272, 275-79 (McLeese, J., dissenting) disagreed with the majority's conclusion that there was not reasonable suspicion to stop the defendant, taking issue with the majority's evaluation of the record, the weight given to the defendant's flight, including the characterization of it as provoked, and the weight given to an officer's testimony about the high-crime area. Because, here, Washington's flight was clearly unprovoked and the high-crime area testimony was much more specific, any outcome of the rehearing would not change our analysis.

robberies in the area[.]" Even more specifically, Detective Lopez testified that he had seized approximately 10 to 15 handguns on the specific block of Oakmont Avenue where Washington was stopped within a three-month period in the last year.

Detective Rodriguez testified that the area was known for shootings and robberies and that he had worked those types of crimes in the area. Detective Rodriguez identified the area in question, the 3700 block of Oakmont Avenue, as a high-crime area. Similarly, Detective Noesi testified: "We know that area is one of the areas that has high crime and [a] large amount of individuals selling and distributing narcotics." Although Detective Noesi initially described the entire neighborhood of Park Heights as a high-crime area, he later limited his description to a more specific geographic location: "areas of Reisterstown [Road] and side streets[,]" including Cordelia and Oakmont Avenues, where the incident in question took place. Detective Noesi testified that the "areas of Reisterstown [Road] and side streets[,]" including Cordelia and Oakmont Avenues, had "high crime and [a] large amount of individuals selling and distributing narcotics"; as such, this was not the description of a general area, without boundaries, as discussed in Mayo, 266 A.3d at 267-68.

In our view, the reasonable suspicion analysis requires support from specific facts such that testimony concerning a location being a high-crime area must be particularized as to the location or geographic area at issue, the criminal activity known to occur in the area, and the temporal proximity of the criminal activity known to occur in the area to the time of the stop. Testimony must identify a location or geographic area, not an overly broad region, and particular criminal activity occurring in the not-too-distant past, to

support the conclusion that the location is indeed a high-crime area. Additionally, the conduct giving rise to officers' suspicions must not be inconsistent with the nature of the crimes alleged to establish the high-crime area. See Sizer, 456 Md. at 371, 174 A.3d at 338.[12]

Such considerations were satisfied by the testimony in this case. The geographical area was not overly broad, as the detectives' testimony was focused on the area of Reisterstown Road, and Cordelia and Oakmont Avenues. Detective Lopez's testimony was even more specific, regarding the exact block on which Washington was stopped. This specificity extended to the nature of the criminal activity as Detective Lopez described seizing approximately 10 to 15 handguns on the block over a three-month period in the prior year. Likewise, Detective Rodriguez testified that the area was known for shootings and robberies and that he was aware of those types of crimes in the area. In addition, Detectives Rodriguez and Lopez were partners and had been part of the Northwest District Action Team, Detective Rodriguez for approximately five months prior to Washington's stop and Detective Lopez for approximately two years prior to the suppression hearing. Detective Rodriguez testified that members of the Action Team had been assigned to patrol high-crime areas, which included the 3700 block of Oakmont Avenue.

The testimony by the police officers in this case was particularized enough to establish the existence of a high-crime area as a factor supporting reasonable suspicion for

---

[12]These considerations are similar but not identical to the factors cited by Judge Adkins in her concurring and dissenting opinion in Sizer, 456 Md. at 381, 174 A.3d at 345 (Adkins, J., concurring and dissenting).

Washington's stop. This is not a case in which there was conflicting evidence regarding the high-crime nature of an area or that otherwise requires us to resolve the "problematic implications" or "usefulness" of this factor in a reasonable suspicion analysis, as aptly noted by the Appellate Court of Maryland in its decision. Washington, 2022 WL 873315, at *6-7.

### *Additional Case Law from Other Jurisdictions*

Courts in other jurisdictions have recently addressed flight as a factor in the reasonable suspicion analysis. In Commonwealth v. Warren, 58 N.E.3d 333, 336 (Mass. 2016), the Supreme Judicial Court of Massachusetts held that officers lacked reasonable suspicion to stop the defendant. In Warren, an officer in a marked police vehicle saw the defendant and another African American man walking near a park in Boston and believed that they matched the general description provided by the victim of a burglary earlier that night. See id. at 336-37. The officer told the two men to "wait a minute[,]" and the men saw the officer, turned, and jogged into the park. Id. at 337. Upon the two men leaving the park, two other officers tried to stop them, but the defendant (one of the men) ran back into the park and clutched the side of his pants. See id. Officers eventually detained the defendant and found a gun near him. See id. at 337-38.

The Supreme Judicial Court of Massachusetts concluded that reasonable suspicion was not generated by the victim's description of the burglars, the proximity of the park where the men were walking to the victim's home, the lack of other pedestrians in the area, and the defendant's flight. See id. at 339-43. Addressing the latter circumstance, the Court determined that flight as a factor in the reasonable suspicion analysis could not be separated

from recent findings in a report that the Boston Police Department had engaged in a pattern of racial profiling of African American men. See id. at 342. The Court observed that the study, based on data from the police department, revealed that in Boston, police were more likely to target African American men for "stops, frisks, searches, observations, and interrogations" as well as "disproportionally target[ them] for repeat police encounters." Id. (footnotes omitted). The Court determined that these findings suggested that "flight is not necessarily probative of a suspect's state of mind or consciousness of guilt." Id. The Court reaffirmed "flight as a factor in the reasonable suspicion analysis[,]" but concluded that, given this reality, "a judge should, in appropriate cases, consider the report's findings in weighing flight as a factor in the reasonable suspicion calculus." Id.

In United States v. Brown, 925 F.3d 1150, 1152 (9th Cir. 2019), the United States Court of Appeals for the Ninth Circuit held that officers lacked reasonable suspicion to stop the defendant. In that case, a 911 caller reported an African American man with a gun in a Seattle YWCA and relayed a description of the man. See id. An officer in a patrol vehicle responded to the 911 call and saw the defendant, who matched the description. See id. The officer activated the emergency lights and drove after the defendant, who fled. See id. Ultimately, officers stopped the defendant and found a gun and drugs on him. See id. at 1152-53.

The Ninth Circuit concluded that "the totality of the circumstances [did] not add up to enough: no reliable tip, no reasonable inference of criminal behavior, no police initiative to investigate a particular crime in an identified high crime area, and flight without any previous attempt to talk to the suspect." Id. at 1157. The Ninth Circuit stated that when

"evaluating flight as a basis for reasonable suspicion, [it could not] totally discount the issue of race" because of how "uneven" policing practices can affect innocent people's reaction to law enforcement. Id. at 1156. The Ninth Circuit observed that, since Wardlow, awareness of "racial disparities in policing" had increased, resulting in part from greater "availability of information and data on police practices." Brown, 925 F.3d at 1156 (footnote omitted). The Ninth Circuit observed that the Seattle Police Department was the subject of a report by the Department of Justice concerning excessive force and racially discriminatory policing, as well as a consent decree. See id. at 1156 n.2. The Ninth Circuit determined that such data could not replace Wardlow's "commonsense judgments and inferences about human behavior" standard in the reasonable suspicion analysis, but could "inform the inferences to be drawn" from an individual's flight from police. Brown, 925 F.3d at 1156 (quoting Wardlow, 528 U.S. at 125, and citing Wardlow, 528 U.S. at 133 (Stevens, J., concurring in part and dissenting in part)). Accordingly, the Ninth Circuit explained that it was "particularly hesitant to allow flight to carry the day in authorizing a stop" "when every other fact posited by the government weighs so weakly in support of reasonable suspicion[.]" Id. at 1157. Notably, the Ninth Circuit did not abandon flight as a factor that could weigh in favor of establishing reasonable suspicion and acknowledged that "flight *may* be suggestive of wrongdoing[.]" Id. (emphasis in original).

In People v. Horton, 142 N.E.3d 854, 857-58, as modified on denial of reh'g (Ill. App. Ct. Nov. 18, 2019), the Appellate Court of Illinois held that an officer lacked probable cause to arrest the defendant. In that case, two officers in an unmarked police vehicle passed a house in Chicago, where two people were on the porch and the defendant was

standing in front of them with a metallic object in his waistband. See id. at 859. The officers exited the vehicle, and the defendant turned and rushed inside the house. See id. The officers went inside, found the defendant crouching next to a bed, and found a handgun under the mattress. See id.

The Appellate Court of Illinois concluded that the arresting officer lacked probable cause to believe that the defendant possessed a gun, let alone that such possession was criminal. See id. at 857-58. Addressing the defendant's flight, the Court determined that it could not "ignore the well-documented, reasonable, and noncriminal impulse to avoid interactions with police" and that the Court was "mindful of the reluctance of black men interacting with police[.]" Id. at 858.

The Court observed that, like the Massachusetts Supreme Judicial Court in Warren, it had the benefit of a report on policing in the most populous city in the state. See Horton, 142 N.E.3d at 868. Specifically, the Appellate Court of Illinois quoted a report by the Department of Justice "finding reasonable cause to believe that the Chicago Police Department had engaged in a 'pattern or practice' of unreasonable force, and that this practice, even when citizens are physically unharmed, leads to 'fear and distrust' from citizens." Id. (citation omitted). The Appellate Court of Illinois noted that this mistreatment was not colorblind, as African American and Latino residents in particular expressed that Chicago police "assume that they are the perpetrators of crime and unfairly target them." Id. (cleaned up). According to the report, Chicago police at times "intentionally stop their cars and open the door to see if anyone runs; if they do, the officers give chase." Id. (citation omitted). The Appellate Court of Illinois stated that this was

evidence of what "the Supreme Court of Massachusetts feared—'the police could turn a hunch into a reasonable suspicion by inducing the [flight] justifying the suspicion.'" Id. (quoting Warren, 58 N.E.3d at 341) (alteration in original). The Appellate Court of Illinois clarified that it was not addressing the motives of the officers in Horton, but rather discussed Warren and the Department of Justice report "to highlight that an eminently reasonable and noncriminal reason explains [the defendant]'s actions after seeing the police." Horton, 142 N.E.3d at 868. The Appellate Court of Illinois reiterated that flight from police can establish reasonable suspicion in combination with other factors indicating "suspicious or illegal behavior." Horton, 142 N.E.3d at 867 (citations omitted).[13]

In this case, although we reach a conclusion similar to that of courts from other

---

[13]In United States v. Black, 707 F.3d 531, 536, 538-39 (4th Cir. 2013), the Fourth Circuit held that the totality of the factors considered by the trial court failed to support a conclusion that police had reasonable suspicion to detain a defendant prior to his attempted flight. Police officers approached a group of men in a parking lot at night in a high-crime area, after the police had followed one man there from a gas station. See id. at 534-35. The defendant, an African American man, was among the group and offered his identification card to an officer, who did not return the card as he continued to obtain identification information from the group. See id. at 534-36. When the defendant acted nervously and attempted to walk away, he was told that he was not free to leave, and police ultimately chased him and discovered a handgun in his possession, illegally. See id. at 536.

Determining that the defendant was seized at the time his identification was retained, the Fourth Circuit concluded that reasonable suspicion had to exist at that moment, not when the defendant acted nervous and was told that he could not leave. See id. at 538-39. The Fourth Circuit concluded that the factors the trial court outlined—"an individual's presence at a gas station; prior arrest history of another individual; lawful possession and display of a firearm by another; [the defendant]'s submission of his ID showing an out-of-district address to [an officer], all of which occurred in a high crime area at night"—failed to establish reasonable suspicion. Id. at 539. The Fourth Circuit stated that, to "conclude that mere presence in a high crime area at night is sufficient justification for detention by law enforcement is to accept *carte blanche* the implicit assertion that Fourth Amendment protections are reserved only for a certain race or class of people." Id. at 542.

jurisdictions with respect to flight in the reasonable suspicion analysis where unprovoked flight occurs in a high-crime area—namely, that unprovoked flight under the circumstances of the case may be considered as a factor in the analysis—we arrive at a different outcome than the courts in the cases above. In other words, we agree that, when undertaking a reasonable suspicion analysis, a trial court may consider whether a defendant's flight was consistent with innocence when unprovoked flight is alleged to be a factor supporting reasonable suspicion for a stop. As detailed below, however, under the circumstances of this case, taking into account the evidence established at the suppression hearing, we conclude that Officer Rodriguez had reasonable suspicion to detain Washington.

### *Applying the Principles Above to This Case*

Applying the principles discussed above to the circumstances of this case leads to the conclusion that Detective Rodriguez had reasonable suspicion to stop Washington. The nature and circumstances of Washington's unprovoked flight in a location that was a high-crime area lead us to this conclusion. In this case, at the sight of officers who were a distance away from him in a car as he was standing in an alley, Washington fled, headlong, completely unprovoked, simultaneously with the other individual standing near him in the alley, fled other officers in a different car, jumped fences, and attempted to conceal himself behind a bush to elude the officers.

Washington not only fled at the mere sight of Detectives Noesi and Winkey, but also fled when he spotted Detectives Rodriguez and Lopez. Washington first took unprovoked, headlong flight from Detectives Noesi and Winkey, when he saw them in a police car on the street as he stood in an alley with another person. He then engaged in

unprovoked, headlong flight from Detectives Lopez and Rodriguez, when he saw them in a vehicle as he was fleeing from Detectives Noesi and Winkey. As he fled, Washington took additional evasive maneuvers when he jumped a fence and attempted to hide behind a bush. He fled a third time when he realized that trying to hide behind a bush was insufficient, and jumped another fence, with Detective Rodriguez stopping him thereafter.

To be sure, a key tenet of the Fourth Amendment's protections is that a person who is not involved in criminal activity "has a right to ignore the police and go about his business." Wardlow, 528 U.S. at 125 (citation omitted). Without more, such avoidance cannot be the basis for reasonable suspicion. See id. Unprovoked, headlong flight is a different matter, though, which may allow an inference of suspicion. See id. at 124-25. The term "headlong" means "without deliberation[,] recklessly[,]" "without pause or delay[,]" and "lacking in calmness or restraint[.]" *Headlong*, Merriam-Webster (2022), https://www.merriam-webster.com/dictionary/headlong [https://perma.cc/SE5X-BBAU] (capitalization omitted). Thus, headlong flight is reckless, without deliberation or delay, flight lacking in calmness or restraint. In Wardlow, 528 U.S. at 124, the Supreme Court stated that its cases had "also recognized that nervous, evasive behavior is a pertinent factor in determining reasonable suspicion. Headlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." (Citations omitted). In other words, context matters. Just as a bulge in a person's clothing has different implications for a reasonable suspicion analysis depending on "where it is, what it looks like, or the circumstances surrounding its observation[,]" Ransome v. State, 373 Md. 99, 107, 816 A.2d 901, 906 (2003), the nature

- 53 -

and circumstances surrounding flight from police make a difference.

We agree with the State that "'headlong' implies that the defendant was not simply leaving the area in a reasonable manner to passively *avoid* the police and go about one's business but, rather, the defendant was actively *evading* the police in a rapid, frantic, or suspicious manner." (Emphasis in original) (citations omitted). See, e.g., United States v. Franklin, 323 F.3d 1298, 1302 (11th Cir. 2003) (The United States Court of Appeals for the Eleventh Circuit concluded that the defendant's "flight was particularly suspicious because of its nature and its duration" when "[h]e ran away at full speed as soon as he saw the officers" rather than "turn and start to walk away" or otherwise "act like he was going about his business" and described such flight as "'headlong' flight[.]"); United States v. Smith, 633 F.3d 889, 894 (9th Cir. 2011) (The United States Court of Appeals for the Ninth Circuit concluded that an officer's determination that the defendant's "sudden flight was suggestive of wrongdoing was reasonable" where the defendant "was in a high-crime neighborhood during the events in question, [the officer] clearly identified himself as a police officer, and [the defendant] burst into headlong flight for no other reason than to evade" the officer.). Compare United States v. Valentine, 232 F.3d 350, 357 (3d Cir. 2000) (The United States Court of Appeals for the Third Circuit stated that "[w]alking away from the police hardly amounts to the headlong flight considered in *Wardlow*[.]"). That avoiding contact with a police officer may offer little to nothing in a reasonable suspicion assessment does not mean that unprovoked, headlong flight is of equally limited relevance in a reasonable suspicion analysis. Washington's unprovoked, headlong flight from police officers along with his other maneuvers were acts of evasion that contributed to a finding

- 54 -

of reasonable suspicion for a Terry stop.

In evaluating whether Washington's flight supports a finding of reasonable suspicion for a stop, we also cannot overlook that he and a second person fled. Both Washington and the person who had been standing in an alley with him immediately fled at the same time upon noticing a police car. To construe this circumstance as consistent with innocence and not a factor weighing in favor of supporting reasonable suspicion of criminal activity would require a conclusion that two people who saw a marked police car at the same moment, concurrently experienced fear of the officers in the car at the same time, and simultaneously decided that innocent flight was the best alternative.

Equally significant is the circumstance that Washington fled purely upon seeing Detectives Noesi and Winkey driving by. There is no indication in the record that the detectives took any action toward Washington, such as attempting to approach him, or that Washington had any particular familiarity with the officers that would have caused him to flee. The same observations can be made with respect to Detectives Lopez and Rodriguez when Washington saw them. Even when we consider in the analysis the possibility that Washington may have feared the police due to an increased public awareness of officers having mistreated citizens, the facts remain that Washington engaged in serial unprovoked, headlong flight, took evasive maneuvers, and attempted to conceal himself after merely seeing officers drive by. There was no provocation or even a suggestion that the detectives were going to initiate contact with Washington. In both Bost and Sizer, defendants fled after police officers approached them, and we credited such unprovoked flight as a factor in the reasonable suspicion analysis. See Bost, 406 Md. at 359-60, 958 A.2d at 367; Sizer,

456 Md. at 371, 174 A.3d at 338. In this case, because the detectives, initially, did not even stop their vehicle, much less approach Washington, we conclude that the unprovoked nature of the flight weighs more heavily in favor of reasonable suspicion in this case than the flight in cases such as Bost and Sizer, in which officers initially attempted to approach a defendant.

That the unprovoked, headlong flight took place in a high-crime area supports the existence of reasonable suspicion. The officers' testimony at the suppression hearing was not only specific as to the crimes that had occurred in the particular area where the stop occurred, but also anchored the criminal activity to a time relatively recent to the stop. The officers' testimony concerning the nature of the crimes that had occurred in the area was not vague, nor was the nature of the crimes inconsistent with Washington's conduct. This is not a case in which it can be said that the appellation "high-crime area" was used by a police officer simply to justify a stop.

Certainly, as Detective Noesi acknowledged on cross-examination, many people who live in this particular high-crime area are not involved in drug activity. And such residents may have occasion to run down alleys from time to time. But the circumstances surrounding Washington's stop are not so commonplace or ordinary as to make them non-probative of criminal activity, as, for example, the facts were in Cartnail, 359 Md. at 291, 753 A.2d at 530, a case in which we indicated that the facts offered in support of reasonable suspicion did not tend to "eliminate a substantial portion of innocent" people. (Quoting Ferris, 355 Md. at 387, 735 A.2d at 507). It is well established that the level of suspicion required for a Terry stop is a low bar. Under the circumstances of this case, Washington's

unprovoked, headlong flight at the sight of police officers, his evasive actions, and his attempt to conceal himself, along with evidence establishing that this occurred in a high-crime area, were sufficient to clear it.

Applying the factors discussed by Justice Stevens in his opinion in Wardlow leads us to the same conclusion. See Wardlow, 528 U.S. at 129-30 (Stevens, J., concurring in part and dissenting in part). Of course, "[t]he time of day," early afternoon on a Thursday in July, does not enhance the suspiciousness of Washington's flight. Id. at 129 (Stevens, J., concurring in part and dissenting in part). Nor does "the way the [person] was dressed," as no facts or inferences indicate that Washington's clothing was suspicious. Id. (Stevens, J., concurring in part and dissenting in part). On the other hand, "the number of people in the area" supports an inference that Washington's flight was suspicious because it eliminates the inference that he was running from someone other than police officers, as no one else was around, aside from the other person in the alley, whose simultaneous flight, as discussed above, supports a greater degree of suspicion. Id. (Stevens, J., concurring in part and dissenting in part). In this case, all of the officers were in uniform, and the initial flight was from a marked police car, which weighs against an innocent inference, particularly given that the officers initially made no attempt to approach Washington. See id. (Stevens, J., concurring in part and dissenting in part). "[T]he character of the neighborhood," "the direction and speed of the flight, and whether the person's behavior was otherwise unusual" all contribute to make Washington's unprovoked flight a factor that weighs in favor of establishing reasonable suspicion rather than an innocent occurrence. Id. at 129-30 (Stevens, J., concurring in part and dissenting in part).

In closing, we caution that our conclusion in this case is a highly fact-specific outcome, as the result of such analyses must always be. On the specific facts of this case—Washington's unprovoked, headlong flight and his other evasive maneuvers in a high-crime area—the totality of the circumstances supported reasonable suspicion for the officers to stop him and investigate further.

## II. Article 26

### The Parties' Contentions

Washington contends that the stop violated Article 26 and that the violation requires exclusion of the handgun. Washington acknowledges that this Court has never held that Article 26 provides greater protection than the Fourth Amendment or adopted an independent exclusionary rule for evidence seized in violation of Article 26. Washington argues that we should take both such actions in light of an increased public awareness of police misconduct across the country in general and in Maryland in particular.

The State responds that we should decline to expand our interpretation of Article 26. The State contends that the Fourth Amendment provides ample protection against unreasonable seizures. The State argues that expanding Article 26 for the reasons requested would be bad policy because officers cannot take a person's race and subjective lived experience into account when determining whether they have reasonable suspicion. Finally, the State asserts that this case would be a poor vehicle for an expansion of Article 26 because Washington's behavior was objectively unusual and suspicious.

### Analysis

As Washington recognizes, we interpret Article 26 *in pari materia* with the Fourth

Amendment, meaning that the protections under Article 26 are coextensive with those under the Fourth Amendment.  See, e.g., Whittington v. State, 474 Md. 1, 23 n.17, 252 A.3d 529, 542 n.17 (2021); King v. State, 434 Md. 472, 482, 76 A.3d 1035, 1041 (2013); Fitzgerald v. State, 384 Md. 484, 506, 864 A.2d 1006, 1019 (2004).[14]  As we stated nearly a decade ago, "[a]lthough we have asserted that Article 26 may have a meaning independent of the Fourth Amendment, we have not held, to date, that it provides greater protection against state searches than its federal kin.  Rather, we rejected uniformly such assertions."  King, 434 Md. at 483, 76 A.3d at 1041 (citations omitted).  Additionally, "never have we concluded explicitly and with clarity that an exclusionary rule, permitting the suppression of [] evidence as a remedy for an alleged Article 26 violation, exists under our state constitutional law."  Id. at 483, 76 A.3d at 1042 (citations omitted).  In King, id. at 484, 76 A.3d at 1042, we pointed out that granting the defendant "the relief he [sought] under Article 26 would require both a departure from our traditional interpretation of the bounds of Article 26, as well as the adoption of a state law-based exclusionary rule."  We declined to do so and reiterated that, "in construing Article 26, decisions of the Supreme Court are entitled to great respect."  Id. at 484, 76 A.3d at 1042 (cleaned up).

---

[14]Our holding in Leidig v. State, 475 Md. 181, 241, 256 A.3d 870, 905 (2021), concerning the Sixth Amendment to the United States Constitution and Article 21 of the Maryland Declaration of Rights, is not instructive here.  In Leidig, we departed from our historical stance that the State and federal provisions were to be read *in pari materia* because we needed to provide "clarity and predictability[,]" as the Supreme Court had reached an unresolved "impasse concerning what makes a scientific report testimonial under the Sixth Amendment."  Id. at 236, 241, 256 A.3d at 902, 905.  No corresponding impasse or lack of clarity exists with respect to the Supreme Court's Fourth Amendment jurisprudence.

We do the same here. We see no necessary reason to engraft onto our State Constitution a deviation from the Supreme Court's Fourth Amendment precedent regarding the totality of the circumstances analysis to be used when assessing whether reasonable suspicion exists. Where, as in this case, a defendant engages in unprovoked, headlong flight from officers and other evasive conduct in an area established to be a high-crime area, factors exist that, when considered together, can suffice to meet the low bar for justifying a Terry stop. The same result would not necessarily occur if any of the circumstances were lacking—*e.g.*, where the defendant does not flee but simply walks away, or where the area is not established to be a high-crime area.

As discussed above in Part I, when weighing the import of a defendant's flight, the totality of the circumstances may include consideration of the circumstance that unprovoked flight may occur for innocent reasons, including those associated with fear of police officers. If the other factors surrounding an officer's stop weigh "weakly in support of reasonable suspicion," as the Ninth Circuit observed in Brown, 925 F.3d at 1157, a trial court may rightly be "hesitant to allow flight to carry the day in authorizing a stop." Our Fourth Amendment cases reveal that we do not shy away from tossing out "thin gruel" when the facts relied on by the State to justify a Terry stop "do not constitute ingredients that are sufficiently potent . . . to enrich the porridge to the constitutionally required consistency of reasonable suspicion." Crosby, 408 Md. at 513, 970 A.2d at 907.

Having affirmed the continued validity of the construction of Article 26 *in pari materia* with the Fourth Amendment, we conclude that, in this case, Detective Rodriguez did not violate Washington's rights under either the Fourth Amendment or Article 26.

**JUDGMENT OF THE APPELLATE COURT OF MARYLAND AFFIRMED. PETITIONER TO PAY COSTS.**

Circuit Court for Baltimore City
Case No. 420234003
Argued: November 3, 2022

IN THE SUPREME COURT

OF MARYLAND*

No. 15

September Term, 2022

_____

TYRIE WASHINGTON

v.

STATE OF MARYLAND

_____

Fader, C.J.,
Watts,
Hotten,
Booth,
Biran,
Gould,
Eaves,

JJ.

_____

Dissenting Opinion by Hotten, J.

_____

Filed: December 19, 2022

* At the November 8, 2022 general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Appeals to the Supreme Court of Maryland. The name change took effect on December 14, 2022.

I respectfully dissent. The United States Supreme Court's decision in *Illinois v. Wardlow*, 528 U.S. 119, 120 S. Ct. 673 (2000), and this Court's prior decisions have held that unprovoked flight or presence in a high-crime area are *merely factors* that *may* contribute to the reasonable suspicion analysis, rather than a bright-line rule. In all circumstances, reasonable suspicion must be supported by an articulable factual basis that "criminal activity is afoot." *Crosby v. State*, 408 Md. 490, 505-06, 970 A.2d 894, 903 (2009) (quoting *Terry v. Ohio*, 392 U.S. 1, 17, 88 S. Ct. 1868, 1878 (1968)). In the case at bar, despite conceding Petitioner engaged in wholly innocent conduct, the detectives pursued Petitioner solely because he fled in a high-crime area without provocation. In doing so, the detectives abandoned the totality of the circumstances test in favor of a bright-line rule based upon unprovoked flight in a high-crime area, devoid of any objectively particularized facts amounting to reasonable suspicion of criminal activity. Accordingly, I would hold that the detectives did not have reasonable suspicion to stop Petitioner and would reverse the Appellate Court of Maryland (at the time named the Court of Special Appeals of Maryland).[1]

I. **The test for reasonable suspicion is the totality of the circumstances, rather than a bright-line rule focused on unprovoked flight in a high-crime area.**

The skeletal facts in this case do not support reasonable suspicion because the detectives failed to articulate any facts that initiated their pursuit, other than Petitioner's unprovoked flight in a high-crime area. The Fourth Amendment provides that "[t]he right

---

[1] At the November 8, 2022 general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Special Appeals of Maryland to the Appellate Court of Maryland. The name change took effect on December 14, 2022.

of the people to be secure . . . against unreasonable searches and seizures, shall not be violated[.]" U.S. Const. amend IV. Additionally, Article 26 of the Maryland Declaration of Rights, Maryland's analogue to the Fourth Amendment, provides:

> That all warrants, without oath or affirmation, to search suspected places, or to seize any person or property, are grievous and oppressive; and all general warrants to search suspected places, or to apprehend suspected persons, without naming or describing the place, or the person in special, are illegal, and ought not to be granted.

Md. Const. Decl. of Rts. art. 26. Article 26 of the Maryland Declaration of Rights is co-extensive with the Fourth Amendment of the United States Constitution. *King v. State*, 434 Md. 472, 482–84, 76 A.3d 1035, 1040–42 (2013) ("[T]his Court has interpreted historically Article 26 *in pari materia* with the Fourth Amendment of the U.S. Constitution.") (citations omitted); *Whittington v. State*, 474 Md. 1, 23 n.17, 252 A.3d 529, 542 n.17 (2021) (noting that "this Court has held the protections of Article 26 to be co-extensive with those afforded by the Fourth Amendment"); *Padilla v. State*, 180 Md. App. 210, 227, 949 A.2d 68, 78 (2008) (noting that this Court "has never held that Article 26 provides greater protection from State interference than its federal counterpart").

A permissible warrantless seizure includes an investigatory stop (i.e., "*Terry* stop"), where a police officer briefly stops an individual upon "reasonable suspicion that criminal activity is afoot[,]" supported by articulable facts. *Crosby*, 408 Md. at 503, 970 A.2d at 901 (quoting *Terry*, 392 U.S. at 17, 88 S. Ct. at 1878). Under this Court's precedent, detectives required a nexus between Petitioner's unprovoked flight in a high-crime area and criminal wrongdoing. *Bost v. State*, 406 Md. 341, 360, 958 A.2d 356, 367 (2008)

2

("Guns often accompany drugs, and many courts have found an 'indisputable nexus between drugs and guns.'") (citation omitted). Indeed, "the nature of the area is relevant to reasonable suspicion when the suspect's activities appear to be the kind of criminal activity that is *likely* to be occurring there." *Sizer v. State*, 456 Md. 350, 380, 174 A.3d 326, 344 (2017) (Adkins, J., concurring and dissenting in part, joined by Hotten, J.). This "nexus" requirement ensures police officers do not "simply assert that innocent conduct was suspicious to him or her[]" to generate reasonable suspicion. *Crosby*, 408 Md. at 508, 970 A.2d at 904. Here, the detectives lacked any factual nexus between Petitioner's conduct and criminal wrongdoing. The detectives proactively patrolled an area allegedly known for guns and drug trafficking, but they acknowledged Petitioner did not engage in any conduct suggestive of, or consistent with, such criminal behavior before he fled.

Additionally, detectives lacked "reasonable suspicion," i.e., a "particularized and objective basis for suspecting the particular person stopped of criminal activity[.]" *Bost v. State*, 406 Md. at 356, 958 A.2d at 365 (internal quotations and citations omitted). Police officers can only establish "a particularized suspicion" when: (1) they base their assessment upon "various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers[,]" which is a process that deals "with probabilities[]" and not "hard certainties," and (2) the aforementioned assessment "must raise a suspicion that the

3

particular individual being stopped is engaged in wrongdoing." *Sizer*, 456 Md. at 366, 174 A.3d at 336 (citations and internal quotations omitted).[2]

The State argues "[t]he critical question is whether *unprovoked, headlong* flight from the police is so commonplace and such an ordinary behavior among *innocent* persons that it is *unreasonable* to interpret a person's flight as suggestive of criminal wrongdoing." Despite "readily conced[ing]" there are ample innocent reasons to fear and flee from police, the State contends that the Fourth Amendment does not require officers "rule out a suspect's innocent explanation for suspicious facts." *In re D.D.*, 479 Md. 206, 231, 277 A.3d 949, 963 (2022) (citing *District of Columbia v. Wesby*, ___ U.S. ___, 138 S. Ct. 577,

---

[2] The State argues detectives seized Petitioner after Detective Rodriguez apprehended him, which means any observations before that seizure contributed to reasonable suspicion. Neither the Appellate Court nor Petitioner directly addressed this issue, but timing matters when determining what factors Detective Rodriguez could consider before he seized Petitioner. Here, detectives seized Petitioner once they pursued and cornered him on the other side of the alley. Police officers may seize an individual "by means of physical force, or show of authority along with submission to the assertion of authority[.]" *Ferris v. State*, 355 Md. 356, 375, 735 A.2d 491, 501 (1999) (citation omitted). Whether an encounter with police officers constitute a Fourth Amendment seizure depends on "whether a reasonable person would have felt free to leave." *Id.* at 375, 735 A.2d at 501 (citation omitted). Factors that indicate a seizure occurred include: a threatening presence of several officers, blocking the citizen's path, the time and place of the encounter, the number of officers present and whether they were uniformed, whether the police removed the person to a different location or isolated him or her from others, and whether the police exhibited threatening behavior or physical contact that would suggest to a reasonable person that he or she was not free to leave. *Swift v. State*, 393 Md. 139, 150, 153, 899 A.2d 867, 873, 875 (2006) (citation omitted). Here, the stop occurred in an alley where detectives cornered and isolated Petitioner. A reasonable person would not feel free to leave when two uniformed police officers pursued him in a marked car and two additional uniformed officers in an unmarked car blocked his path of escape. Petitioner likely felt threatened by four officers converging on him in an alley. Therefore, detectives seized Petitioner once they cornered him during his encounter with Detectives Rodriguez and Lopez, which limits indicia of suspicion to observations Detective Rodriguez made at the time he first encountered Petitioner, i.e., unprovoked flight in a high-crime area.

588 (2018)).  In the case at bar, the detectives observed innocent and innocuous conduct before their pursuit.  Indeed, Detectives Noesi and Rodriguez testified that they did not observe Petitioner involved in *any* suspicious behavior before he fled.  In other words, the detectives observed Petitioner's unprovoked flight in a high-crime area and pursued him, perhaps under the pretense that guilty persons do not run.  In their haste, the detectives neglected a crucial step in their reasonable suspicion inquiry.  They failed to provide "a particularized and objective basis for suspecting the particular person stopped of *criminal activity*[.]"  *Bost*, 406 at 356, 958 A.2d at 365.  The bar for reasonable suspicion may be lower than probable cause, but "an inchoate and unparticularized suspicion or 'hunch[]'" does not suffice.  *Crosby*, 408 Md. at 507, 970 A.2d at 904 (citations omitted).

II.    **Neither *Wardlow* nor this Court's prior decisions have held that unprovoked flight in a high-crime area categorically generates reasonable suspicion.**

*Wardlow* and this Court's precedent never held that unprovoked flight in a high-crime area *per se* constitutes reasonable suspicion.  Instead, they held that police officers *may* consider "an individual's unprovoked flight or presence in a high crime area, or both, [as] *individual factors* that *may* contribute to the reasonable suspicion calculus."  *Sizer v. State*, 456 Md. at 367, 174 A.3d at 335–36 (emphasis added).[3]

---

[3] The United States Supreme Court's opinions generally invoke the central holding in *Wardlow* regarding unprovoked flight in cases where police already have other indicia of suspicion or to affirm that unprovoked flight is only a factor in the *Terry* analysis.  *See, e.g., Michigan v. Chesternut*, 486 U.S. 567, 575, 108 S. Ct. 1975, 1980 (1988) (holding that police officers had reasonable suspicion to stop individuals hosting a loud party at a vacant property, including individuals who hid in a closet or bathroom after seeing officers); *Lange v. California*, ___ U.S. ___, 141 S. Ct. 2011, 2035 (2021) (Roberts, C.J., concurring) (arguing that police officers have reasonable suspicion to stop a driver who

(continued . . .)

## A.    *Illinois v. Wardlow*.

In *Wardlow*, two uniformed police officers patrolled an area known for heavy narcotics trafficking to investigate drug-related criminal activity.  528 U.S. at 121, 120 S. Ct. at 674.  The police officers eventually encountered Wardlow holding an opaque bag who fled down an alley after seeing the officers.  *Id.* at 121–22, 120 S. Ct. at 674–75.  The officers pursued Wardlow, apprehended him, searched for weapons, and recovered a handgun.  *Id.* at 122, 120 S. Ct. at 675.  In upholding the *Terry* stop, the United States Supreme Court held that unprovoked flight or "[h]eadlong flight" from police officers is a factor under the reasonable suspicion analysis because it is "the consummate act of evasion" and "certainly suggestive of [wrongdoing]."  *Id.* at 124, 120 S. Ct. at 676.  The Court reasoned that, while individuals have a right to ignore police and go about their business, unprovoked flight, "by its very nature, is 'not going about one's business[.]'"  *Id.* at 125, 120 S. Ct. at 676.  The Court further reasoned that "*Terry* accepts the risk that officers may stop innocent people[,]" even if it is "undoubtedly true[]" that flight does not

plays loud music, honks his horn on the highway, and refuses to pull over upon an officer's show of authority); *Kansas v. Glover*, ___ U.S. ___, 140 S. Ct. 1183, 1185, 1189 (2020) (noting the "unremarkable observation" that "[h]eadlong flight" is a factor in the reasonable suspicion determination); *Utah v. Strieff*, 579 U.S. 232, 252, 136 S. Ct. 2056, 2069 (2016) (Sotomayor, J., dissenting) (cautioning that police degrade American citizens by using pretextual justifications, such as "how [an individual] behaved," to conduct a *Terry* stop); *Rodriguez v. United States*, 575 U.S. 348, 367–69, 135 S. Ct. 1609, 1622–23 (2015) (Thomas, J., dissenting) (arguing that police officers had reasonable suspicion to stop a driver because the driver veered between the shoulder and highway, the odor of air freshener emanated from the vehicle, the passenger refused to make eye contact, and both the driver and passenger appeared extremely nervous).

necessarily indicate ongoing criminal activity. *Id.* at 125–26, 120 S. Ct. at 677. While the Court focused on the factor of unprovoked flight, the Court noted that police need not "ignore the relevant characteristics of a location" and may consider presence in a "high-crime area" when determining whether to stop an individual. *Id.* at 124, 120 S. Ct. at 676.

### B. *Bost v. State*.

In *Bost*, uniformed Washington D.C. police officers approached about a dozen individuals, including Bost, who were drinking alcohol in a high-crime area that prohibited loitering. 406 Md. at 346, 958 A.2d at 359. Upon seeing the police, Bost immediately left the area while "clutching his right waistband with his right elbow. *Id.*, 958 A.2d at 359. Believing Bost concealed a weapon, officers pursued Bost into Prince George's County, Maryland, apprehended him, and recovered a gun from his jacket and cocaine from his pants pocket. *Id.* at 345, 958 A.2d at 359. This Court first held that the Uniform Act on Fresh Pursuit authorized police officers to pursue Bost into Maryland, and then held that police had reasonable suspicion to stop Bost. *Id.* at 357–60, 958 A.2d at 365–67. While this Court held that "unprovoked flight is enough to support reasonable suspicion that a crime has been committed[,]" this Court emphasized the "indisputable nexus between drugs and guns[]" as the glue between Bost's presence in a high-crime area and his otherwise innocent behavior, such as clutching his waistband. *See id.* at 358, 360, 958 A.2d at 366–67 (internal citations and quotations omitted).

### C. *Sizer v. State*.

In *Sizer*, five or six uniformed Howard County police officers observed a group of individuals drinking from a beverage in a brown paper bag and play fighting in area in

7

Columbia, Maryland described as a "high-crime area." 456 Md. at 357–59, 174 A.3d at 330–31. The officers suspected the beverage was alcohol because the group's body language suggested they were inebriated. *Id.* at 357, 174 A.3d at 330. The officers approached the group after someone threw a bottle that hit the ground. *Id.*, 174 A.3d at 330. Sizer fled from the officers when he first noticed them about five feet away. *Id.*, 174 A.3d at 330. The officers quickly apprehended Sizer and later recovered a handgun from his backpack and oxycodone from his sock. *Id.* at 357–58, 174 A.3d at 330. In upholding the officers' reasonable suspicion, this Court held that "an individual's unprovoked flight or presence in a high crime area, or both, are *individual factors* that *may* contribute to the reasonable suspicion calculus." *Id.* at 367, 174 A.3d at 336 (emphasis added) (citation omitted). This Court reasoned that "the officers had reasonable suspicion to investigate the group prior to Mr. Sizer's flight[]" because officers observed the group consuming alcohol and discarding the bottle. *Id.* at 374, 174 A.3d at 340.

### D. Application of prior decisions to the case at bar.

The Appellate Court incorrectly interpreted *Wardlow*, *Sizer*, and *Bost* to mean that detectives have reasonable suspicion to stop anyone who flees from police in a high-crime area without provocation, absent any articulated factual basis for criminal wrongdoing.

First, this interpretation disregards the other indicia of suspicion present in *Wardlow*, *Sizer*, and *Bost*. The stop in *Wardlow* involved: (1) a stop in a high-crime area; (2) unprovoked flight; and (3) an opaque bag. 528 U.S. at 121–22, 120 S. Ct. at 674. The stop in *Sizer* involved (1) a stop in a high-crime area; (2) a group of individuals drinking an unknown beverage; (3) inebriated behavior; (4) a thrown bottle; (5) presence in a high-

crime area; and (6) unprovoked flight. 456 Md. at 357–59, 174 A.3d at 330–31. Notably, officers had reasonable suspicion to stop the suspect in *Sizer before* he fled. *See id.*, 174 A.3d at 330. Sizer's flight certainly increased the suspicion that he threw the bottle, but his unprovoked flight in a high-crime area was not, by itself, dispositive. *See id.*, 174 A.3d at 330. Similarly, the stop in *Bost* involved: (1) a group of individuals drinking alcohol; (2) presence in a no-loitering area; (3) presence in a high-crime area; and (4) unprovoked flight. 406 Md. at 346, 958 A.2d at 359. Contrary to the State's assertion, this Court's decision in *Bost* does not support the proposition that unprovoked flight, alone, generates reasonable suspicion, because that case involved indicia of suspicion beyond unprovoked flight, and, regardless, the officers in *Bost* had reasonable suspicion to stop the suspect *before* he fled.

Second, unlike in *Wardlow*, *Bost*, and *Sizer*, the detectives in this case did not articulate any particularized objectively factual basis to stop Petitioner other than his unprovoked flight in a high-crime area. The Fourth Amendment prohibits police officers from "simply assert[ing] that apparently innocent conduct was suspicious to him or her; rather, the officer must offer 'the factual basis upon which he or she bases the conclusion.'" *Ferris v. State*, 355 Md. at 391–92, 735 A.2d at 510 (quoting *Derricott v. State*, 327 Md. 582, 591, 611 A.2d 592, 597 (1992)). The State cannot paradoxically concede that "innocent individuals may flee from the police for [a myriad of] innocent reasons[,]" while characterizing unprovoked flight as so unusual and abnormal that it is categorically suggestive of wrongdoing. Detectives Noesi and Rodriguez confirmed that they did not observe Petitioner engaged in any suspicious behavior, such as hand-to-hand transactions,

and they did not receive any complaints about Petitioner's conduct. Detective Lopez did not observe a "bulge" on Petitioner's person until *after* he jumped over a fence to escape Detective Rodriguez, not at the inception of the pursuit. In other words, the *only* factors in the *Terry* analysis in this case were: (1) presence in a high-crime area; and (2) unprovoked flight from law enforcement officers. That falls far short of the factors present in *Wardlow* and its progeny.

**III.**      **Reasonable suspicion requires a factual nexus between criminal wrongdoing and unprovoked flight in a high-crime area.**

The reasonable suspicion inquiry requires a basis of articulable facts that connects criminal wrongdoing to otherwise innocent or innocuous conduct. Overly policed neighborhoods have a myriad of innocent reasons to distrust and evade law enforcement, and that evasion, alone, cannot categorically satisfy the reasonable suspicion test.

Police officers may not convert the Fourth Amendment into a "rubber stamp" that authorizes them to label *anyone* who avoids them as suspicious simply because the officer "believes" it. *Ransome v. State*, 373 Md. 99, 110–11, 816 A.2d 901, 908 (2003). While courts defer to an officer's training, that deference "is not without limits." *Holt v. State*, 435 Md. 443, 461, 78 A.3d 415, 425 (2013). The Fourth Amendment only authorizes a *Terry* stop when an officer, based upon an objective observation, infers and deduces "the particular individual being stopped is engaged in wrongdoing." *Id.* at 460–61, 78 A.3d at 425 (citation omitted). "[I]t is impossible for a combination of wholly innocent factors to combine into a suspicious conglomeration unless there are concrete reasons for such an interpretation." *Crosby*, 408 Md. at 512, 970 A.2d at 907 (cleaned up).

10

The State frames the question before the Court as follows:

[T]he question here is not how common it is for *any* person to flee from the police. Rather, the critical question is whether *innocent* flight from the police is so commonplace and ordinary that interpreting flight as suggestive of criminal wrongdoing would be unreasonable.

According to the State, if unprovoked flight from police was so "commonplace and ordinary," then "[o]ne would expect to see *innocent people* scatter and flee every time a police officer turned the corner." There are two flaws in the State's reasoning.

First, the State implies the occurrence of *one* factor under the reasonable suspicion analysis is categorically indicative of criminal wrongdoing, simply because "innocent flight" is probably suspicious of *something*, and "innocent" people do not regularly run from police. That is not the test for reasonable suspicion. The Fourth Amendment required the detectives to explain *why* they suspected "criminal activity was afoot[]" based solely on his unprovoked flight in a high-crime area. *Crosby*, 408 Md. at 503, 970 A.2d at 901 (citation omitted). They failed to do so. Detectives observed Petitioner casually standing in an alley. Petitioner ran after seeing the detectives, and thereafter the detectives immediately pursued Petitioner.[4] It follows that Petitioner is suspicious because . . . ? That question remains unanswered. It fell on detectives to have an answer *before* their pursuit. *See Longshore v. State*, 399 Md. 486, 506, 924 A.2d 1129, 1140 (2007) ("The

---

[4] The Appellate Court expressly limited its holding to Petitioner's unprovoked flight in a high-crime area. *Washington v. State*, No. 0739, Sept. Term, 2021, 2022 WL 873315, at *2 n.2, *5 (Md. Ct. Spec. App. Mar. 24, 2022). I similarly limit my analysis to those factors.

11

reasonableness of a *Terry* stop is determined by considering 'whether the officer's action was justified at its inception[.]'") (cleaned up).

Second, at its core, reasonable suspicion considers "common sense," "aspects of daily life[,]" and "how reasonable and prudent people act." *Id.* at 507, 924 A.2d at 1141. The United States Department of Justice released a report in 2016 concluding that the Baltimore City Police Department engaged in a racially discriminatory pattern of making stops in violation of the Fourth Amendment. U.S. Dep't of Justice, Civil Rights Div., Investigation of the Baltimore City Police Department, at 24–30, 47–54, (Aug. 16, 2016), https://www.justice.gov/crt/file/883296/download, *archived at*: https://perma.cc/YJU8-6YAW. In the last ten years alone, there were numerous high-profile police killings of Black people, including Tamir Rice on November 22, 2014[5], Eric Garner on July 17, 2014[6], Freddie Gray, Jr., on April 19, 2015[7], Breonna Taylor on March 13, 2020[8], and George

---

[5] Press Release, U.S. Dep't of Justice, *Justice Department Announces Closing of Investigation into 2014 Officer Involved in Shooting in Cleveland, Ohio* (Dec. 29, 2020), https://www.justice.gov/opa/pr/justice-department-announces-closing-investigation-2014-officer-involved-shooting-cleveland, *archived at*: https://perma.cc/Z36Z-2DRW.

[6] Press Release, U.S. Dep't of Justice, *Statement by United States Attorney Richard P. Donoghue* (July 16, 2019), https://www.justice.gov/usao-edny/pr/statement-united-states-attorney-richard-p-donoghue, *archived at*: https://perma.cc/AR8M-CWB8.

[7] Press Release, U.S. Dep't of Justice, *Federal Officials Decline Prosecution in the Death of Freddie Gray* (Sept. 12, 2017), https://www.justice.gov/opa/pr/federal-officials-decline-prosecution-death-freddie-gray, *archived at*: https://perma.cc/WL9V-HPJB.

[8] Richard A. Oppel, Jr., et al., *What to Know About Breonna Taylor's Death*, N.Y. TIMES (Aug. 23, 2022), https://www.nytimes.com/article/breonna-taylor-police.html, *archived at*: https://perma.cc/F4HT-JJF2 .

Floyd on May 25, 2020[9]. Since 2015, police killed Black Americans at more than twice the rate of White Americans—forty-two Black American deaths per million compared to seventeen White American deaths per million.[10] Similarly, police kill Hispanic Americans at almost twice the rate of White Americans—thirty Hispanic deaths per million. *Id.*[11]

For many, these deaths illustrate that deadly police encounters are commonplace and justice is scarce. As a result, overly policed communities, especially communities of color, grow distrustful of law enforcement. Police, through whatever metric they have, may label those communities as "high-crime areas"—communities that many Maryland residents call home.[12] Children raised in those communities may learn to avoid police as

---

[9] Press Release, U.S. Dep't of Justice, *Three Former Minneapolis Police Officers Convicted of Federal Civil Rights Violations for Death of George Floyd* (Feb. 24, 2022), https://www.justice.gov/opa/pr/three-former-minneapolis-police-officers-convicted-federal-civil-rights-violations-death, *archived at*: https://perma.cc/985X-NA3S.

[10] Julie Tate, *et al.*, *Fatal Force*, WASHINGTON POST (Updated Nov. 21, 2022), https://www.washingtonpost.com/graphics/investigations/police-shootings-database/, *archived at*: https://perma.cc/LQ9C-8V6A.

[11] Unfortunately, police killings of Hispanic Americans remain underreported, and the precise number of deaths each year remain unknown. *See* Roque Planas, *The Fatal Police Shootings You Aren't Hearing About*, HUFFINGTON POST (Jul. 14, 2016), https://www.huffpost.com/entry/latinos-hispanic-killed-police_n_57878af8e4b03fc3ee4f62ae, *archived at*: https://perma.cc/4YH5-4CLM.

[12] The term "high-crime area" has never been judicially defined. *Sizer*, 456 Md. at 379 n.1, 174 A.3d at 343 n.1 (Adkins, J., concurring and dissenting joined by Hotten, J.) (citation omitted). A generalized description of a location as "high crime," absent any "nexus between the nature of the area and the observed activities[,]" cannot support reasonable suspicion. *Id.* at 380, 174 A.3d at 344. At a minimum, courts should consider three factors "relevant to the 'high crime' designation, and the designation's relationship to reasonable suspicion": (1) "the nexus between the type of crime most prevalent or common in the area and the type of crime suspected in the instant case"; (2) the "limited

(continued . . .)

*a survival tactic*. *Wardlow*, 528 U.S. at 125, 120 S. Ct. at 676 (noting that "reasonable suspicion must be based on commonsense judgments and inferences about human behavior"). For those communities, the presence of law enforcement does not necessarily herald hope. In his concurring opinion in *Wardlow*, Justice Stevens recognized the possibility that "unprovoked flight is neither 'aberrant' nor 'abnormal'" for individuals living in "high-crime areas." *Id.* at 132–33, 120 S. Ct. at 680–81 (Stevens, J., concurring in part and dissenting in part). Justice Stevens further noted that police themselves know of "these concerns and fears[.]" *Id.* at 133, 120 S. Ct. at 680–81 (Stevens, J., concurring in part and dissenting in part). For overpoliced communities, fear concerning deadly police encounters limits the extent to which police may rely merely on unprovoked flight in an alleged "high-crime area."[13]

Nothing in the Fourth Amendment shields police officers from public distrust or, in light of that distrust, paints otherwise innocuous behavior as suspicious. *See Crosby*, 408 Md. at 507, 970 A.2d at 904 (citations omitted) (noting that "an inchoate and

---

(. . . continued)
geographic boundaries of the area"; and (3) "temporal proximity between evidence of heightened criminal activity and the date of the stop or search at issue[.]" *Id.* at 381, 174 A.3d at 344 (citing *United States v. Wright*, 485 F.3d 45, 53–54 (1st Cir. 2007).

[13] In *Wardlow*, Justice Stevens' opinion cautioned that adopting *per se* rules is "profoundly unwise," "[g]iven the diversity and frequency of possible motivations for flight[.]" *Wardlow*, 528 U.S. at 129–30, 120 S. Ct. at 679 (Stevens, J., concurring in part and dissenting in part). He explained that "[u]nprovoked flight[]" "describes a category of activity *too broad and varied to permit* per se *reasonable inference* regarding the motivation for the activity." *Id.* at 136, 120 S. Ct. at 682 (Stevens, J., concurring) (emphasis added).

14

unparticularized suspicion or 'hunch[]'" will not satisfy the reasonable suspicion inquiry). The courts cannot simultaneously acknowledge the experiences of communities in "high-crime areas" and any "commonsense" conduct derived therefrom, while invalidating them as irrelevant for purposes of the reasonable suspicion analysis. *See Glover*, ___ U.S. at ___, 140 S. Ct. at 1189–90 (noting that the reasonable suspicion analysis accounts for "information that is accessible to people generally"). At a minimum, the detectives were required to explain a particularized objectively factual basis for believing Petitioner "*engaged in* [*criminal wrongdoing*]." *Sizer*, 456 Md. at 365, 174 A.3d at 336 (emphasis added). Under these skeletal facts, a decision in the State's favor risks converting the Fourth Amendment's protections into a "rubber stamp" for *Terry* stops in "high-crime areas," so long as police officers say, "we found it suspicious that this otherwise unremarkable person ran away from us in broad daylight." The Fourth Amendment was meant to prohibit such intrusions.

### CONCLUSION

In the record before us, no particularized objective facts amounting to reasonable suspicion were articulated that would satisfy the constitutional standards expressed by *Wardlow*. A decision in favor of Petitioner would not ignore *Wardlow* or this Court's prior decisions because no precedent held that unprovoked flight in a high-crime area, by itself, is dispositive. *Wardlow* and its progeny merely affirmed that the reasonable suspicion standard requires a totality of the circumstances analysis. That precedent does not support police officers stopping anyone who flees from them in a high-crime area, absent an articulable basis that the individual is engaged in criminal activity.

15

For these reasons, I respectfully dissent and would reverse the judgment of the Appellate Court of Maryland.

The correction notice(s) for this opinion(s) can be found here:

https://mdcourts.gov/sites/default/files/import/appellate/correctionnotices/coa/15a22cn.pdf